KIMBERLY HILLS NEIGHBORHOOD ASSOCIATION v DION

Docket No. 43678. Submitted October 9, 1980, at Detroit.—Decided
April 5, 1982. Leave to appeal applied for.

Harry A. and Patricia Lynch Dion are owners of an 18-acre site
in southeast Ann Arbor. The Dions, through Dion Ventures,
Inc., planned to construct on the site single-family homes. The
Kimberly Hills Association, a voluntary association of about
110 residents in the area, and various individual residents in
the area brought an action in Washtenaw Circuit Court seeking
an injunction pursuant to the Michigan Environmental Protec-
tion Act which would prohibit the Dions and Dion Ventures,
Inc., from developing the northerly 9.2 acres of the 18-acre site.
Plaintiffs alleged that development of the northerly portion of
the site would pollute, impair or destroy the air, water or
natural resources. Following evidentiary hearings, Benjamin C.
Stanczyk, J., found that development of the site would impair
or destroy certain natural resources, to wit: natural growth
containing a myriad of trees and shrubs and a seasonal pond
which was the natural wildlife habitat for a myriad of animals
and wildfowl, including opossums, raccoons, skunks, rabbits,
squirrels, pheasants, woodpeckers and numerous songbirds. The
trial court entered an order enjoining defendants from disturb-
ing, polluting, impairing or destroying the seasonal pond or
changing the natural characteristics of the area in the vicinity
of the pond. A four-acre portion of the site, including the
seasonal pond, was set aside as a nature preserve along with
corridors to be left in a natural state to provide access by wild
animals to the nature preserve from surrounding areas. Defen-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4] 16 Am Jur 2d, Constitutional Law §§ 337, 339.
[1, 2] 73 Am Jur 2d, Statutes §§ 203, 209, 210, 272, 273.
[2] 73 Am Jur 2d, Statutes §§ 145, 146, 155.
[3, 4] 16A Am Jur 2d, Constitutional Law §§ 421, 422.
[5-8] 4 Am Jur 2d, Animals § 14.
  35 Am Jur 2d, Fish and Game §§ 37, 50.5.
  72 Am Jur 2d, States, Territories, and Dependencies § 66.
  Validity, construction, and application of Endangered Species Act of
    1973 (16 USCS §§ 1531-1543). 32 ALR Fed 332.

dants appealed to the Court of Appeals. Defendants then sought leave to appeal to the Supreme Court prior to the decision by the Court of Appeals on questions certified by the trial court, which was denied by the Supreme Court. *Held:*

1. While none of the trees, shrubs or wild animals or fowl found on the land owned by defendants was rare or endangered, such habitat and wildlife are natural resources within the meaning of the Environmental Protection Act. Whether injunctive relief under the act was appropriately granted thus turns upon the question of whether plaintiffs made a prima facie showing that there was or would be impairment or destruction of a natural resource within the meaning of the Environmental Protection Act.

2. The determination of whether there is an impairment or destruction of a natural resource within the meaning of the Environmental Protection Act must focus upon the overall statewide effect upon the wildlife populations rather than upon the effect upon the individual animals in the area at issue or upon the limited local populations.

3. The rarity of the natural resource involved should be considered in determining the magnitude of the harm resulting from destruction of a natural habitat. Where the natural resource is rare, any destruction or impairment of that natural resource may amount to impairment or destruction of a natural resource within the meaning of the Environmental Protection Act, while if the natural resource is more common, the destruction of a local habitat may not raise the resulting harm to the level of impairment or destruction of a natural resource within the meaning and intent of the protections afforded by the Environmental Protection Act.

4. Since the trial court found that neither the natural habitat existing on defendant's land nor the wild animals or fowl living on that land were unique or rare, the destruction of the local natural habitat caused by the development of defendants' land will have no significant effect upon the maintenance of diversified natural areas or any wildlife population when viewed from a statewide perspective. The trial court, therefore, erred in finding that plaintiffs established a prima facie case of impairment or destruction of a natural resource within the meaning of the Environmental Protection Act. Since plaintiffs failed factually to establish a right to relief under the act, it is unnecessary to consider the question of whether the relief granted was an unconstitutional taking of property without just compensation.

Reversed.

1. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — LEGISLATIVE
   PURPOSE.

   The Legislature, in establishing environmental rights by the
   Environmental Protection Act, did not set forth an elaborate
   scheme of detailed provisions, but spoke as precisely as the
   subject matter permits and left to the courts the task of giving
   substance to the standard by developing a common law of
   environmental quality (MCL 691.1201 *et seq.;* MSA 14.528[201]
   *et seq.).*

2. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — COMMON-
   LAW DEVELOPMENT.

   The Environmental Protection Act allows the courts to fashion
   standards in the context of actual problems as they arise in
   individual cases and to take into consideration changes in
   technology which the Legislature at the time of the act's
   passage could not hope to foresee (MCL 691.1201 *et seq.;* MSA
   14.528[201] *et seq.).*

3. ENVIRONMENT — CONSTITUTIONAL LAW — ENVIRONMENTAL PROTEC-
   TION ACT.

   The constitution confers no authority on the courts to preserve
   and protect the environment; it provides, rather, that the
   Legislature shall provide for the protection of the natural
   resources of the state, which it has done by enacting the
   Environmental Protection Act (Const 1963, art 4, § 52; MCL
   691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

4. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT.

   A court is not empowered by the Environmental Protection Act
   to prevent any conduct, whether originally proposed or alterna-
   tive, even though the court finds some other alternative action
   is more desirable, which does not rise to the level of environ-
   mental risk proscribed by the act; the standard, "has, or is
   likely to pollute, impair or destroy", is a limitation as well as a
   grant of power (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

5. ANIMALS — NATURAL RESOURCES — ENVIRONMENTAL PROTECTION
   ACT.

   Wild animals, including those wild animals which are not rare or
   endangered, are natural resources within the meaning and
   scope of the Environmental Protection Act (MCL 691.1201 *et
   seq.;* MSA 14.528[201] *et seq.).*

6. ENVIRONMENT — NATURAL RESOURCES — ENVIRONMENTAL PROTEC-
   TION ACT.

   The determination of whether there is impairment or destruction

of a natural resource within the meaning of the Environmental Protection Act must focus upon the overall statewide effect upon the wildlife populations at issue rather than upon the individual animals affected or upon limited local populations (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

7. ENVIRONMENT — NATURAL RESOURCES — ENVIRONMENTAL PROTECTION ACT.

A court in determining whether to grant relief pursuant to the Environmental Protection Act must consider the rarity of a natural resource in evaluating the magnitude of the harm to that natural resource affected by a particular proposed action, since, if the natural resource is not rare, the magnitude of the harm caused by a particular proposed action may not be raised to the level of being an impairment or destruction of a natural resource within the meaning of the statute (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

8. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — ACTIONS.

Relief under the Environmental Protection Act is not appropriately granted where the property at issue is not unique in character nor is it the natural habitat for any unique or rare plants or wildlife and the destruction of the natural habitat will not have a significant impact upon either the local or statewide population of the wildlife affected (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

*Rentrop & Martin* (by *Jeffrey K. Haynes),* for plaintiffs.

*Hill, Lewis, Adams, Goodrich & Tait* (by *Robert L. Henry, Jr.),* for defendants.

Amicus Curiae:

*Joseph L. Sax,* for the Environmental Law Society of the University of Michigan Law School.

Before: D. C. RILEY, P.J., and N. J. KAUFMAN and MacKENZIE, JJ.

MacKENZIE, J. Plaintiffs brought this action to obtain equitable relief under the Michigan Envi-

ronmental Protection Act (hereinafter MEPA), MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.* In such an action plaintiff must make a prima facie case by showing "that the conduct of the defendant has, or is likely to, pollute, impair or destroy the air, water or other natural resources or the public trust therein". MCL 691.1203; MSA 14.528(203). We hold that plaintiffs here failed to make out such a prima facie case. The trial court's decision is, therefore, reversed.

Defendants are owners of an 18-acre site in southeast Ann Arbor on which they planned to construct single-family homes. The property was used for farming from the mid-19th century until the 1920's and is now covered with second-growth trees and brush. When defendants purchased the property on November 7, 1977, it was located in Pittsfield Township and zoned to permit construction of single-family homes on lots with an area of at least 10,000 square feet. The City of Ann Arbor annexed the property on August 17, 1978. The property was subsequently rezoned to permit construction of single-family homes on lots with an area of at least 7,200 square feet. Plaintiffs are the Kimberly Hills Neighborhood Association, a voluntary association of about 110 residents of the area, and various individual residents. Plaintiffs' complaint sought an injunction against construction or development on the northerly 9.2 acres of defendants' land.

After suit was commenced on February 6, 1979, the trial court signed an *ex parte* interim restraining order prohibiting construction on the property during the pendency of the suit. Following a hearing on the temporary restraining order, the court modified the order to permit construction of four homes on a portion of the property. On March 28, 1979, after an evidentiary hearing on the request

for a permanent injunction, the trial court issued an opinion and order granting a permanent injunction, requiring that defendants set aside at least four acres in the northwesterly portion of the property for a nature preserve and as a mating and breeding ground for pheasants in order to protect natural resources. Defendants were permanently enjoined from filling in, building upon, disturbing, polluting, impairing, or destroying a seasonal pond on the premises and defendants were also permanently enjoined from building upon or changing the natural characteristics of a specific area of the premises in the vicinity of the pond. In addition, defendants were ordered to set aside a corridor approximately 20 feet wide along the entire westerly border of the land in order to provide an access way for animal life. Further, defendants were ordered to provide two corridors approximately 40 feet wide for use by wildlife in an east-west direction, with one such corridor leading into the ordered nature preserve.

We attach as Appendices 1 and 2 copies of the trial court's opinion and order.

Defendants sought direct review of the trial court's decision by the Supreme Court under GCR 1963, 852. Pursuant to this application, the trial court, on April 2, 1979, certified two questions for review by the Michigan Supreme Court: (1) whether the MEPA permitted or required that private property be taken for public use without just compensation, and (2) whether, as applied to this case, the action of the trial court constituted such a taking. See Appendix 3, a copy of the trial court's certification of questions. The Supreme Court, however, denied leave for such direct appeal.

Testimony indicated defendants' land included a

diverse wetland, containing an intermittent pond providing a wildlife habitat for a number of species, some of which might not continue to exist on the property if the land were developed. There was testimony that part of defendants' 9.2 acres acted as a corridor for wildlife to travel through the area to defendants' land and to other similarly undeveloped property in the area.

Donald Inman, an environmental specialist in the Environmental Enforcement Division of the Michigan Department of Natural Resources (hereinafter DNR), testified that the state did not intervene in this suit because it saw no biological uniqueness to the habitat existing on the property. Patrick Ross of the faculty of the Urban Environment Studies Program of Grand Valley State College testified that the subject land would be an inappropriate place to establish a nature center. Terrence Pfeiffer, a consultant with an environmental consulting firm, testified that development of the property could result in the destruction of the habitat of those pheasants presently living there.

The standard in MCL 691.1203; MSA 15.528(203) for determining whether the defendants' development of the property will result in "pollution, impairment or destruction" of a natural resource within the meaning of the act is derived from Const 1963, art 4, § 52:

"The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."

The operative provision granting the plaintiffs the right to maintain this action is MCL 691.1202; MSA 14.528(202), which provides:

"[Plaintiff] may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief * * * for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction."

The statute does not specifically define "natural resource". In *Ray v Mason County Drain Comm'r*, 393 Mich 294, 306; 224 NW2d 883 (1975), the Supreme Court stated that the Legislature left it to the courts to evolve the precise meaning of the broad terms of the statute:

"The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality." (Footnote omitted.)

Continuing, the Court observed that the reason for the broad, undefined standards contained in the act was to allow individual cases to take into consideration future changes in technology and the impact of such technology on our environmental standards.

Subsequently, the Supreme Court cautioned the lower courts against taking advantage of this flexibility to go beyond their authority and develop an ad hoc environmental policy for the state as they

saw fit. In *PBB Action Committee v Dep't of Natural Resources,* 403 Mich 215, 231; 268 NW2d 240 (1978), the Court said:

"Const 1963, art 4, § 52, confers no authority on the courts. It provides, rather, that '[t]he legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction'. The Legislature has done so by enacting the environmental protection act. That act does not confer plenary power on the courts to do whatever they may think preferable in environmental cases. Absent a finding that the conduct of the defendant has or is likely to pollute, impair or destroy, the court may not order another alternative even though it finds it more desirable."

Summarizing the impact of these two parameters in *West Michigan Environmental Action Council v Natural Resources Comm,* 405 Mich 741, 760; 275 NW2d 538 (1979), *cert den* 444 US 941; 100 S Ct 295; 62 L Ed 2d 307 (1980), the Court focused upon the function of the trial court in a suit brought under the act.

"We recognize that virtually all human activities can be found to adversely impact natural resources in some way or other. *The real question before us is when does such impact rise to the level of impairment or destruction?"* (Emphasis added.)

A dual inquiry must be conducted: (A) whether a natural resource is involved, and (B) whether the impact of the activity on the environment rises to the level of impairment to justify the trial court's injunction.

## A

Plaintiffs argued that all animals and presently

existing plant life and conditions naturally located on land are natural resources and, therefore, to remove or destroy them is to pollute, impair, or destroy natural resources under the statute. Plaintiffs argued these natural resources are to remain inviolate unless defendants can show there is no "feasible and prudent alternative". Defendants, on the other hand, urged that the Legislature intended that the term "natural resource" under the statute be limited to those resources unique or relatively rare or in some way ecologically important, upon which the defendants' conduct will have a substantial adverse impact. We reject defendants' definition of natural resource and plaintiffs' conclusions.

In *West Michigan Environmental Action Council, supra,* our Supreme Court was concerned with the adverse impact the drilling of exploratory wells would have on elk in the Pigeon River Country State Forest. The Court found the unique, almost endangered species of elk, bear, bobcat, osprey, and bald eagles to be natural resources. We do not interpret this case to narrowly define natural resources to unique or endangered species.

In *Michigan United Conservation Clubs v Anthony,* 90 Mich App 99, 106; 280 NW2d 883 (1979), a panel of this Court held that "[t]he fish population of the Great Lakes is a natural resource of the state". The *Anthony* Court found both the rare Great Lakes sturgeon and the common Great Lakes catfish to be natural resources.

The trial court's findings support the plaintiff's allegations that defendants' land provides:

"a. A natural wildlife habitat for myriad animals and

wildfowl, including but not limited to opossums, raccoons, skunks, rabbits, squirrels, pheasants, woodpeckers and numerous songbirds.

"b. An area of natural growth containing myriad trees and shrubs, including but not limited to juniper, apple, elm, oak, walnut, maple, cottonwood and cherry.

"c. A seasonal natural pond which increases the wildlife carrying capability of the area and which also serves to collect natural water runoff.

"d. It serves as a center for and provides continuity with contiguous natural areas to even more significantly promote all foregoing public benefits."

We conclude that natural resources which the Legislature intended to protect are involved in this case.

## B

The real question before us is whether the likely impact of defendants' proposed activities rises to the level of impairment or destruction.

In *West Michigan Environmental Action Council,* Justice MOODY found an impairment or destruction of a natural resource on the basis of the limited number of elk, the unique nature and location of the herd, and the apparently serious and lasting damage that would result to the herd from the drilling of the wells. Justice MOODY stated that the trial court found that "adverse impacts will be visited upon particularly the elk and, to some lesser extent, bear and bobcat", and concluded that the record supported this finding. 405 Mich 741, 755. He quoted Gary Boushelle, the DNR wildlife biologist who said there would be "severe adverse environmental effect for some wildlife species". Justice MOODY also quoted E. Ford Kellum, a wildlife biologist and former em-

ployee of the DNR, who stated that the area of the forest in which the exploratory drilling was to occur has "unique, almost endangered species, elk, bear and bobcat, osprey and a bald eagle, of which this was the center of where it looked like if they were going to survive the human race it's gonna' be here". *Id.,* fn 3.

*Ray v Mason County Drain Comm'r, supra,* concerned an action brought by landowners seeking to enjoin a channelization program for the Black Creek watershed consisting of 6,678 acres. The Court, through Justice WILLIAMS, said:

"The area contains a biologically unique 'quaking forest', swamps and potholes, and scattered, wooded areas which serve as a refuge for a wide variety of wildlife." *Id.,* 299.

Although the Court ultimately remanded the case to the trial court for further findings of fact, Justice WILLIAMS observed that the defendants had conceded on appeal that a prima facie case of impairment had been established. *Ray v Mason County Drain Comm'r, supra,* 310, fn 11. Justice WILLIAMS reviewed the pertinent testimony:

"[T]he plaintiffs in the instant action produced testimony *inter alia* from a hydrologist that the water table of the land adjacent to the channel would be lowered as a result of the proposed channelization project. This witness maintained that without proper tests it would be impossible to determine whether the surrounding wetlands were dependent upon the water table such that the lowering of the water table would result in the drying up of wetlands in the area. One of the plaintiffs, a former conservation instructor, described the wetlands, including a biologically unique 'quaking forest' which potentially could be destroyed by the proposed project. A zoology professor discussed the desirability of

preserving the bogs and marshes in order to maintain a diversified natural area for the wildlife. Residents of the area affected testified the project would remove needed water, destroy woodlands, and disfigure the existing country stream-like channel, leaving mounds of unsightly spoil. Evidence also was introduced suggesting that the project would adversely affect the Pere Marquette River." *Id.*

Proper application of the impairment standard as it pertains to the preservation of animal and plant life does not limit conservation only to resources that are "biologically unique" or "endangered"; a statewide perspective is necessary. A focus on narrow local problems is contrary to the intent of the Legislature to carry out its constitutional duty under Const 1963, art 4, § 52.[1] For example, in dealing with wildlife, adverse impact must be evaluated, not in the context of individual animals or neighborhoods, but in the context of populations and ecological communities. See, for example, the discussion of the unreported Dickinson County Circuit Court case of *Payant v Dep't of Natural Resources* in Sax and Conner, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1003, 1031-1035 (1972). In *Payant,* plaintiffs sought to prevent the DNR from authorizing hunting of antlerless deer. The trial court declined to enjoin such hunting upon testimony that such hunting benefited the state's deer

[1] Indeed, a focus on narrow local problems will often be impractical. As DNR wildlife ecologist Donald L. Inman testified during trial:

"There is a possibility that hawks and owls may not use that 18 acre—at least not that northerly 9.2 acres—to the same extent that they used to. We're dealing in some pretty small quantities. It is very difficult to precisely quantify the impact of four houses on the resident population of the wildlife in a very small area.

"Your Honor, we had some difficulty with the elk herd, and that was 125 square miles. If you get down to this finite decision-making, it is very difficult. The discipline of wildlife ecology does not lend itself to splitting hairs quite that thinly."

population as a whole, even though such hunting obviously destroys the individual deer involved.

In *West Michigan Environmental Action Council, supra,* 760, the Court determined that the adverse impact amounted to an impairment as follows:

"In light of the limited number of the elk, the unique nature and location of this herd, and the apparently serious and lasting, though unquantifiable, damage that will result to the herd from the drilling of the ten exploratory wells, we conclude that defendants' conduct constitutes an impairment or destruction of a natural resource."

A close reading of the foregoing language shows that the Court balanced the rarity of the resources involved against the magnitude of the harm likely to result. Since elk are extremely rare in Michigan, destruction of a relatively small number of elk will amount to an impairment. Destruction of the same number of a more common species would not necessarily amount to an impairment. The magnitude of the harm likely to result from defendants' actions depends on the characteristics of the resources involved, the nature of defendants' actions, and the type of property involved.

When the evidence presented by plaintiffs here is measured against the foregoing standard, it does not appear that the impacts shown by plaintiffs amounted to the requisite statutory impairment. The trial court specifically found there was nothing unique in the way of clearings, growth, or species of animals on the 9.2 acres involved. If the property is developed, the intermittent pond may disappear, but there was no evidence that the disappearance of the pond is likely to have a significant effect on the drainage system as a

whole, no evidence that the frogs and other amphibians who make the pond their home are particularly rare, and no evidence that disappearance of the pond is likely to have a significant impact on the population of those amphibians. Several old trees which provide nests for hawks and other birds will be cut down, but there was no evidence that those birds do not have ample nesting areas elsewhere. Similarly, although the brush areas on the property provide cover for rabbits, opossum, and other small animals, and nesting areas for birds and insects, there was no showing that other suitable habitats are not available. Because the small animals, birds, and insects involved are all common, the disappearance of four acres of habitat will not have a significant impact on their population in Michigan or even in the Ann Arbor area. The four acres involved provided a poor habitat for one male pheasant, as each male pheasant requires 3 to 23 acres for territory. That this single male pheasant and his associated females will have to move elsewhere hardly amounts to an impairment of the Michigan pheasant population. In sum, it has not been shown, from a statewide perspective, that development will actually interfere with the maintenance of diversified natural areas for wildlife.

Development of defendants' property will undoubtedly change the character of the neighborhood. Such changes, however, are inevitable on the borderline between urban and rural areas. If the Michigan Environmental Protection Act is to be used as a tool to prevent such changes, the act must be applied to an area broad enough to assure that the relief granted will have some effect. The relief the trial court granted here could be rendered useless by development of surrounding ar-

eas. The narrow local interests represented by plaintiffs here are not interests protected by the act.

We regard the constitutional issue presented as worthy of serious consideration; however, in view of our foregoing determination of the applicability of the statute to the facts presented, we find it unnecessary to be here discussed.

Reversed. No costs, the matter involved being one of public concern.

APPENDIX 1.—MARCH 28, 1979, OPINION OF THE
TRIAL COURT.

This action is brought by a group of landowners who call themselves "The Kimberly Hills Landowners Association". Plaintiffs are all residents of the City of Ann Arbor. They live in the immediate vicinity of the tract of land recently acquired by the defendants and referred [to] herein as the Dion land. Before the trial, the parties furnished the court a stipulated set of facts as follows:

1. On November 7, 1977, Harry Dion and Patricia Dion entered into a sales agreement for the purchase of the Dion property as described in the complaint.

2. They plan to develop the land in accordance with their tentative preliminary plat which includes 68 single-family lots, and 11 two-family lots.

3. The proposed development contains 90 dwelling units.

4. Partial payment of the pruchase price has been made, and lots #1 through 4 in the northeast corner of the Dion property have been con-

veyed to Dion Ventures, Inc., a Michigan corporation.

5. The balance of the Dion property has been conveyed by a warranty deed to Harry Dion and Patricia Dion; this deed is being held in escrow pending payment of the balance of the purchase price.

6. Dion Ventures, Inc., was organized by Harry Dion and Patricia Dion for the purpose, *inter alia,* of developing the Dion property for residential purposes; the Dions are the sole shareholders.

7. Building permits for lots #1 through 4 have been approved by the City of Ann Arbor, and will be issued to Dion Ventures, Inc., upon payment of the appropriate fee.

8. Dion Ventures, Inc., will commence construction on lots #1 through 4 as soon as the permits are issued, unless restrained by court order.

9. Kimberly Hills is a residential subdivision lying to the east and north of the Dion property as depicted in the complaint.

10. The individual plaintiffs are homeowners and residents in Kimberly Hills.

Plaintiffs seek to enjoin the defendants from developing the land in question and ask for a permanent injunction under Act 127 of Public Acts 1970, commonly known as the Environmental Protection Act. MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.* They claim that 9.2-acre portion, or approximately 1/2 of the defendants' land provides:

"1. A natural wildlife habitat for myriad animals and wildfowl, including but not limited to opossums, raccoons, skunks, rabbits, squirrels, pheasants, woodpeckers and numerous songbirds.

"b. An area of natural growth containing myriad treas and shrubs, including but not limited to juniper, apple, elm, oak, walnut, maple, cottonwood and cherry.

"c. A seasonal natural pond which increases the wildlife carrying capability of the area and which also serves to collect natural water runoff.

"d. It serves as a center for and provides continuity with contiguous natural areas to even more significantly promote all foregoing public benefits."

The Dion land was annexed into the City of Ann Arbor in December 1978, and was zoned as residential property in January 1979.

The defendants plan construction of four homes at the northeast corner of the Dion land. They plan this construction immediately and contemplate further development of the remaining portion of the land as soon as the plat therefor is approved by the proper authorities.

On the hearing for a temporary injunction, the court took testimony of 18 witnesses, a total of 24 exhibits were introduced in the 5 days of trial. Several exhibits consisted of as many as 30 parts.

By agreement of all of the parties, all of this testimony and the exhibits are adopted by the court in the hearing for a permanent injunction.

The plaintiffs were granted an interim restraining order on February 8, 1979, which prevented the defendants from developing the northerly 9.2 acres of the Dion land by the construction of homes on said land on the theory that such construction would be a threat to the existing natural condition of the wildlife habitat and a violation of

the Environmental Protection Act. In the course of the hearing, there was much said about the purchase of the Dion land by the City of Ann Arbor for a public nature study area; however, at no time did the city seek to acquire this land by condemnation, nor at any time was an offer to purchase made in writing although the land had been on the market for at least four years and probably as long as ten. The negotiations never got beyond the talking stage. The court is of the opinion that the city fathers of Ann Arbor were waiting for the plaintiffs in this lawsuit to purchase the land and dedicate it to the city for a public purpose, while these plaintiffs and their neighbors were waiting for a grant from the federal government, which would enable the City of Ann Arbor to acquire the land. In the meanwhile plaintiffs enjoyed the luxury of having a private park opposite their homes. When defendants acquired the land, moved for its annexation into Ann Arbor and its rezoning, this action was commenced by the abutting landowners.

The restraining order of February 8, 1979, was modified on March 15, 1979, in order to permit defendants to commence construction of the four houses at the northwest corner of the Dion land. An appropriate order will be entered in accord with this opinion. The restrictions on the conduct of defendants will apply to all tradesmen whether employed directly by defendants or by subcontractors and also to the several public utilities and municipal agencies involved in furnishing water and sewage facilities to the Dion land.

At the hearing for a permanent restraining order the court heard the testimony of 16 witnesses, incorporated all of the testimony received in the hearing for the temporary restraining order

as well as the several exhibits. Several additional exhibits were received.

The questions presented in this lawsuit are novel in this state and probably in the entire country. This case differs from the *Pigeon River* case, *(West Michigan Environmental Action Council v Natural Resources Comm,* Michigan Supreme Court Docket No. 60800, decided February 20, 1979. No citation available at this date.) The case differs in two respects: (1) there is no natural resource on the Dion land which is peculiar to this state. The Pigeon River Forest has the only elk herd east of the Mississippi River. The birds, mammals and flora on the Dion land exist and flourish on all of the surrounding land owned by the plaintiffs and others; (2) the proposed conduct of the defendants will be circumscribed by this order so that important natural resources in existence, that is, ponds, tall trees, animal life, including birds as well as mammals, and access thereto will be protected by this order.

The natural resources to be protected on the Dion land include but are not limited to the wildlife consisting of birds such as pheasants and songbirds, small mammals and insects, the pond on the northwest corner of that land and the surrounding wetlands which support the pond, the brush which provides cover for birds and small mammals, the tall trees on which hawks and other predators roost and the pheasant mating or nest areas, and also the corridors which allow wildlife to travel from the Dion land to the plaintiffs' land, and also the unimproved land directly to the west of the Dion land.

This case differs from the *Pigeon River* case in other respects in that the Dion land is literally an island since there is much undeveloped land to the

west which has the same natural resources as the Dion land, as well as plaintiffs' land to the east of the Dion land. There was ample testimony to the effect that any human activity has a destructive effect on natural resources. It certainly cannot be said that the Legislature contemplated the cessation of all land development in Michigan by the enactment of the Environmental Protection Act of 1970. This court must circumscribe the defendants' activity in the development of this land in such a manner as to protect natural resources and the public trust therein from pollution, impairment or destruction. Since the authority of this court is limited in scope to the parties before the court and the issues framed in the pleadings, the decision reached here is a compromise. Ideally, parts of land directly to the west of the defendants' land as well as parts of the plaintiffs' land should be included in a wildlife preserve together with a portion of the Dion land. However, the court cannot accomplish this ideal solution.

The court makes finding of facts as follows:

1. The Dion land had been farmed for some 80 years prior to 1929, but has been allowed to lay fallow for at least 50 years. It was a family farm on which cattle and horses were raised, chickens were raised and sold for market, and there were fruit trees which were used as a family orchard. At the time that farming operations ceased in 1929 and for many years prior thereto, the land had been cleared except for a few tall trees. There was never any timbering done on the land. The northwest corner had a pond which filled in the spring after the melting snows and occasionally during the rainy season.

2. The land in question described variously by several witnesses does not have water in that pond

all year; however, it does support some aquatic life during the wet season.

3. From all of the conflicting testimony about the various bird and mammal life on the Dion farm, the court comes to the conclusion and finds as a fact that this land and the several surrounding parcels owned by the plaintiffs provide a common habitat for identical animal life.

4. Six of the seven plaintiffs own more than one lot and have allowed some or most of their land to remain unimproved. The Dion land and the several tracts owned by plaintiffs are one natural resource in the sense that songbirds, pheasants and some small mammals, such as rabbits, opossum, etc., use all of their land as their habitat.

5. The Dion land does not serve as a refuge for a vast variety of wildlife. The wildlife there moves freely between plaintiffs' land and the Dion land.

7. *[sic]* There are several parcels of vacant land in the vicinity of the Dion land which are publicly owned and which are available to the public for wildlife studies.

8. There is no natural growth on the Dion land, such as trees, grasses, weeds, etc., which is not found on the plaintiffs' land and other nearby *[sic]*.

9. The pond on the Dion land is a natural resource which should be preserved because (a) it supports some aquatic life and (b) is a storage area for natural runoff of surface waters. This pond must be preserved by the defendants in connection with any contemplated construction. There are several old trees of various varieties on the northerly 9.2 acres of the Dion land, which are a distinct natural resource since they provide nesting places for birds such as hawks and others.

10. These trees and the wetland surrounding the pond described in ¶ 9 above must be preserved by

the defendants in their development of this tract of land since they do constitute a natural resource within the contemplation of the Environmental Protection Act.

11. There is some brush and undercover which forms a cover for nesting birds and insects from Gladstone Street into their land. This must be in an area opposite similar lands owned by the plaintiffs. There must be a corridor on the west of Dion land for this purpose.

12. One or more of the plaintiffs have erected cyclone wire fences on the Gladstone side of their land. They may also have fences elsewhere which are not important to this litigation. These fences interfere with the free movement of wildlife in the area.

The area referred to in ¶ 12 above must be away from these fences in order to preserve and maintain the environment needed to sustain any wildlife in the area.

13. There are no endangered species of animals on the Dion land which will be destroyed by the development of the land consistent with this decision.

14. Pheasants require a minimum of four acres for a breeding ground as territory claimed by one male. To allow an improvement of the entire 18.2 acres of the Dion land will mean the destruction of these breeding grounds. It is necessary to preserve at least four acres of land for this purpose in order to protect this valuable natural resource from destruction. This area may include the small temporary pond in the northwest corner of the Dion property.

15. In order to preserve the pond in its natural state, two conditions must be met: (1) there must be no alteration of the surface drainage into or out

of the pond; and (2) sedimentation of the pond should not be allowed.

16. The construction of storm sewers will not effect the pond since surface drainage in the pond area will not be effected by storm sewers.

17. Corridors referred to in ¶ 11 must consist of (1) two corridors in an east and west direction crossing Gladstone Street approximately 40 feet in width with plantings of suitable shrubs which will furnish both cover and food for birds, small mammals and other wildlife. There must be a corridor on the west side of the Dion property running in a north and south direction which shall be not less than 20-feet wide, planted in a manner similar to that set forth in the requirement for the east/west corridors.

18. It is not practical or possible to replace every destroyed tree with an identical tree. However, defendants may plant more hardy species of trees if ordered to reforest the property upon which homes are built.

19. The bonding requirements of the City of Ann Arbor are adequate to assure the court that these defendants will abide by orders of this Court. No additional bonding is required.

The court finds that the defendants' proposed improvements of the Dion land are not likely to destroy natural resources if these improvements are made as set forth in this decision.

CONCLUSION

The court's order for the defendants to set aside the pond, the three wildlife corridors and the pheasant mating area may appear at first to constitute an unreasonable burden on these defendants. It might be argued that this order is confis-

catory in nature since it prohibits defendants from developing their land in the manner they choose. However, the Environmental Protection Act has been in effect since 1970. The defendants knew of its existence when they bought the land for development. Defendants admit that the City of Ann Arbor requires them to set aside a minimum of 28,000 square feet for recreational purposes which they are willing to do and have offered to convey the pond and surrounding land to the City of Ann Arbor for this purpose.

The question of adequate compensation for the land whose development is being restrained by this order may become paramount. However, since the City of Ann Arbor is not a party to this litigation this court has no authority to compel that municipal corporation to pay defendants for the pond, the access corridors, the pheasant breeding grounds, etc. Defendants cannot compel plaintiffs to compensate them since there is nothing in the Environmental Protection Act which authorizes such payment. Section 2 of the act, MCL 691.1202; MSA 14.528(202) gives this court the authority "to grant equitable relief * * * for the protection of the * * * natural resources and the public trust therein * * * from destruction."

The court finds that plaintiffs have made a prima facie case showing that defendants' conduct is encompassed by § 3 of the Environmental Protection Act. The defendants have not shown that there is no feasible and prudent alternative to their proposed conduct.

The court will continue to maintain jurisdiction of this matter.

APPENDIX 2.—MARCH 28, 1979, ORDER OF THE TRIAL
COURT.

As used in this order, the term "defendants' premises" means the following described premises located in the City of Ann Arbor, Washtenaw County, Michigan:

Beginning at the southwest corner of Lot 146 of Kimberly Hills Subdivision as recorded in Liber 3 of Plats, page 32, Washtenaw County records, Washtenaw County, Michigan; thence east 465.92 feet along the southerly line of Lot 146, Emerald Avenue, Lot 140 and Lot 139; thence S 1°-00'-30" W 870.81 feet along the new centerline of Gladstone Avenue; thence west 465.92 feet to a point on the west line of Section 3, T3S, R6E, Pittsfield Township, Washtenaw County, Michigan; thence northerly 870.81 feet more or less along the west line of said section to the place of beginning, being part of the SW 1/4 of said Section 3, Pittsfield Township (now City of Ann Arbor).

This case having been tried before this court, and the court having determined that certain features of the defendants' premises constitute a natural resource within the meaning of the Michigan Environmental Protection Act; and

The court having determined that the conduct of the defendants in the development of the defendants' premises will or are likely to pollute, impair or destroy said natural resource; and

The court having determined that permanent equitable relief and the imposition of conditions are required to preserve said natural resource from pollution, impairment or destruction;

It is ordered that:

1. Defendants are permanently enjoined from filling in, building upon, disturbing, polluting, impairing or destroying the seasonal pond, the center

of which lies approximately 125 feet south of the north boundary of the defendants' premises and approximately 50 feet east of the west boundary of said premises.

2. Defendants are permanently enjoined from building upon any portion of the defendants' premises lying within 50 feet of the crest of the ridge that defines said seasonal pond, and are permanently enjoined from damaging, destroying, removing or changing the existing natural characteristics of the premises lying within 50 feet of the crest of the ridge that defines said seasonal pond.

3. Defendants are permanently enjoined from installing concrete or asphalt driveways or any fences on the defendants' premises.

4. This order shall apply to the defendants, their agents, employees, officers and assigns and those persons acting in concert or in participation with them who receive actual notice of this order.

5. This order shall run with the land and shall apply to all subsequent owners or occupiers of the defendants' premises or any part thereof.

6. That defendants shall set aside at least four acres in the nortwesterly portion of the Dion land for a nature preserve and mating ground and breeding ground for pheasants in order to protect natural resources thereon from destruction. This area may encompass the pond referred to in the court's opinion.

7. The defendants shall set aside a corridor of approximately 20 feet in width along the entire westerly border of this land in order to provide an access way for animal life.

8. The defendants shall provide two corridors of approximately 40 feet in width for use by wildlife, which shall be in an east/west direction, one of which shall lead into the preserve ordered in ¶ 6

above. The exact location of these corridors will be fixed by the natural terrain, the ground cover now in existence and other physical facts. For purposes of carrying out the provisions of this order the court will be guided by the findings of the Ann Arbor City Planning Commission.

9. Defendants' development and construction shall be carried on in the manner set forth in this court's order of March 15, 1979, modifying the temporary restraining order.

10. Plaintiffs may have such other and further relief as is consistent with the opinion filed heretofore.

11. The corridors set forth in ¶¶ 7 and 8 above and the wildlife sanctuary provided for in ¶ 6 shall be maintained at the natural state without disturbing the natural resources found thereon.

12. An appeal bond for either party shall be in the sum of five hundred ($500) dollars cash.

APPENDIX 3.—ORDER OF THE TRIAL COURT
CERTIFYING QUESTION TO THE SUPREME COURT.

Based upon the testimony presented, the trial court has found that certain natural resources exist on the defendants' property which any building or human activity thereon will impair or destroy. Accordingly, pursuant to MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* the trial court has entered an order permanently enjoining the defendants or their agents or assigns from ever building on a portion of said property and requiring that it be maintained in its natural state in perpetuity. A copy of said order is attached hereto. The trial court believes that such action may constitute a taking of private land for public use. However, since MCL 691.1201 *et seq.;* MSA 14.528(201) *et*

*seq.,* does not provide for compensation to the property owner, the court has awarded no compensation.

Defendants have advised the court that they intend to seek review by the Michigan Supreme Court under GCR 1963, 852 of the following questions:

"Does the Michigan Environmental Protection Act, being Act 127 of the Public Acts of 1970 (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.),* violate art 10, § 2 of the Michigan Constitution and the Fifth and Fourteenth Amendments to the United States Constitution for the reason that said act permits or requires that private property be taken for public use without just compensation?

"As applied in this case, does the action of the trial court pursuant to Act 127 of PA 1970 violate art 10, § 2 of the Michigan Constitution and the Fifth and Fourteenth Amendments to the United States Constitution in that private property belonging to the defendants has been taken for public use without just compensation?"

The trial court believes, and hereby certifies, that the subject matter of the appeal involves a substantial question as to the validity of an act of the Legislature. Because of the potentially serious impact of this decision on private property rights, the trial court further believes, and hereby certifies, that the subject matter of the appeal involves legal principles of major significance to the jurisprudence of this state.