ANTHONY J. PAIGE ET AL. *v.* TOWN PLAN AND
ZONING COMMISSION OF THE TOWN
OF FAIRFIELD ET AL.
(15092)

Callahan, Borden, Berdon, Katz and Palmer, Js.

Argued September 29—decision released November 21, 1995

*Frederic S. Ury,* with whom, on the brief, was *Candace D. Paige,* for the appellants (plaintiffs).

*Roy H. Ervin,* with whom was *Roy H. Ervin, Jr.,* for the appellee (named defendant).

*John F. Fallon,* for the appellee (defendant Fairfield University).

*Richard Blumenthal,* attorney general, and *Janet P. Brooks,* assistant attorney general, filed a brief for the commissioner of environmental protection as amicus curiae.

*Michael Stern* filed a brief for the Connecticut Fund for the Environment, Inc., et al., as amici curiae.

KATZ, J. The sole issue on appeal is whether trees and wildlife, independent of whether they have economic value, fall within the term "natural resources" as it is used in General Statutes § 22a-19 (a) and (b).[1]

The record discloses the following undisputed facts. In July, 1991, the defendant Fairfield University (university) filed with the defendant Fairfield town plan and zoning commission (commission) an application to resubdivide a 13.41 acre wooded site into forty building lots along with an application for a special permit to

[1] General Statutes § 22a-19 provides: "Administrative proceedings. (a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the attorney general, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

"(b) In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."

excavate and fill the land. The plaintiffs, Anthony J. Paige and Candace D. Paige, who are property owners of lots that adjoin the subject property, filed a notice of intervention on behalf of the environment in accordance with § 22a-19 (a). They asserted a claim that approval of the application would have an adverse impact on the environment and that, therefore, the university was required to file alternative plans for the commission's consideration.[2] Specifically, the plaintiffs alleged that because development of the subdivision would require clear-cutting of the subject acreage, the development would likely cause unreasonable pollution, impairment or destruction of the public trust in the air, water, wildlife and other natural resources of the state. Without expressly indicating (1) whether it had determined that natural resources were involved, (2) whether development of the subdivision would cause unreasonable pollution, impairment or destruction of those resources, or (3) whether alternative plans were necessary, the commission approved the university's applications subject to twenty conditions.[3]

---

[2] See footnote 1.

[3] Only the first three conditions are pertinent to this appeal. They are as follows:

"1. A buffer with a minimum depth of twenty (20) feet shall be established along the northerly property lines of Lots 1–12 and along the easterly property lines of lots fronting on North Benson Road (Lots 1, 19, 20, 21, 22, 38, 39, 40) to create and maintain a dense visual screen. These lots shall be conveyed by deeds containing provisions to satisfy the buffer requirement as proposed by the applicant. A draft of a proposed deed shall be submitted for Commission approval.

"2. In conjunction with the above described deed restriction, a landscaping plan shall be submitted for Commission approval. The plan shall include existing and proposed trees and plantings including the use of berming and additional plantings to ensure visual screening to the satisfaction of the Commission.

"3. A tree removal plan indicating existing trees to be removed and existing trees to be maintained in conjunction with subdivision improvements shall be submitted for Commission approval prior to any work commencing on site. Trees to be maintained shall be properly protected during construction and the proposed method of protection to be outlined in the plan."

Following the commission's approval of the applications, the plaintiffs appealed to the trial court pursuant to General Statutes § 8-8 (b).[4] They claimed that as a result of the university's plan to clear-cut 13.4 acres of wooded area, the natural resources, in specific, the trees and wildlife that inhabit that area, would be destroyed. According to the plaintiffs, the commission acted "illegally, arbitrarily and in abuse of its discretion . . . by approving the . . . [a]pplication without considering the proposed development's unreasonable destruction of a natural resource and by failing to consider feasible and prudent alternatives."

The trial court held that trees and wildlife are not natural resources under § 22a-19 (a) and that, consequently, the commission was not obligated to comply with § 22a-19 (b). In reaching that conclusion, the trial court relied on our decision involving agricultural land in *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, 212 Conn. 727, 563 A.2d 1347 (1989). Additionally, the trial court reasoned that, in the absence of a clear legislative direction either in the language of § 22a-19 or in its legislative history, it would refrain from considering trees and wildlife as natural resources because to do otherwise "would potentially be requiring the consideration of alternatives pursuant to General Statutes § 22a-19 (b) for every subdivision application in the state." Accordingly, the trial court dismissed the plaintiffs' appeal. We note that because the trial court determined that natural resources were not involved

---

[4] General Statutes § 8-8 (b) provides: "Except as provided in subsections (c) and (d) of this section and sections 7-147 and 7-147i, any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located. The appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes. The appeal shall be returned to court in the same manner and within the same period of time as prescribed for civil actions brought to that court."

here, and, therefore, that § 22a-19 (b) did not apply, it had no occasion to review the record in order to decide whether the commission had considered the plaintiffs' claim that the subdivision unreasonably would impact adversely the natural resources of the state.

The plaintiffs petitioned the Appellate Court for certification to appeal. Following its grant of that petition, the Appellate Court held, as a matter of law, that to be a "natural resource" under § 22a-19 (a), property must have economic value. *Paige* v. *Town Plan & Zoning Commission*, 35 Conn. App. 646, 651, 646 A.2d 277 (1994). Because the term "natural resource" was not specifically defined in § 22a-19 (a) or (b) to include trees and wildlife, a majority of the Appellate Court construed the term using standard tools of statutory construction to ascertain the legislative intent. The court ultimately adopted a narrow definition of natural resources from Black's Law Dictionary. The court defined the term as " '[a]ny material in its native state which when extracted has *economic value*. Timberland, oil and gas wells, ore deposits, and other products of nature that have economic value.' " (Emphasis added.) Id., 651, quoting Black's Law Dictionary (6th Ed. 1990). Economic value from tourism and research was also included in the definition. Id., 653.

In reviewing the record of the proceedings before the commission to ascertain whether that body could have concluded as a matter of fact that the trees and wildlife had any economic value, the Appellate Court remarked that there had been "no evidence that the subdivision area had economic value. To the contrary, the testimony at the hearing indicated that the area contained absolutely no endangered or rare trees and wildlife that would cause the property to have economic value in tourism and research. Further, the testimony revealed that the property serves no other useful productive use causing the property to have economic

value." Id. Accordingly, the Appellate Court held that because they had no proven economic value, the trees and wildlife were not natural resources under § 22a-19 (a). Id. Therefore, the court concluded that § 22a-19 (b), which would have required the university to propose and the commission to consider feasible alternatives to the subdivision project, did not apply and affirmed the judgment of the trial court.

We granted the plaintiffs' petition for certification limited to the following question: "In the circumstances of this case, did trees and wildlife on the property of the defendant university fall within 'natural resources' as that term is used in General Statutes § 22a-19 (a) and (b), so as to require the defendant commission expressly to consider the possible environmental impact of a proposed subdivision plan?" *Paige* v. *Town Plan & Zoning Commission*, 231 Conn. 934, 649 A.2d 256 (1994). Because we disagree that the determination of whether property is a natural resource depends on a factual determination that the property has economic value and instead conclude that trees and wildlife are natural resources regardless of their economic value, we reverse the judgment of the Appellate Court and remand the case for consideration by the trial court on the question of whether the commission properly applied § 22a-19.

Because § 22a-19 fails to provide a detailed definition of natural resources, we are compelled to produce a definition that reflects legislative intent using traditional tools of statutory construction. "In construing a statute, we seek to ascertain and give effect to the apparent intent of the legislature. . . . *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 390, 618 A.2d 1340 (1993). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement,

and to its relationship to existing legislation . . . . *State* v. *McVeigh*, 224 Conn. 593, 607, 620 A.2d 133 (1993)." (Internal quotation marks omitted.) *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 507–508, 636 A.2d 1342 (1994). We assume that the legislature attempts to create a consistent body of law. *Zachs* v. *Groppo*, 207 Conn. 683, 696, 542 A.2d 1145 (1988). Assuredly, "we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . *Daly* v. *DelPonte*, 225 Conn. 499, 510, 624 A.2d 876 (1993); see also *Simms* v. *Warden*, 229 Conn. 178, 187–88, 640 A.2d 601 (1994)." (Internal quotation marks omitted.) *Derwin* v. *State Employees Retirement Commission*, 234 Conn. 411, 420, 661 A.2d 1025 (1995). Indeed, this tenet of statutory construction requiring us to read statutes together is particularly applicable when the statutes relate to the same subject matter. *Simms* v. *Warden*, supra, 187–88. Finally, "[w]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions." *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991).

The plaintiffs argue that the narrow and restrictive definition of natural resources settled on by the Appellate Court is in derogation of the Environmental Protection Act (act); General Statutes § 22a-1 et seq.; and the applicable Regulations of Connecticut State Agencies promulgated to support its enforcement. We agree that in virtually all statutory references to natural resources, the legislature painted with a broad brush. In view of the various legislative declarations, we conclude that natural resources must be viewed "in terms of values beyond the limited economic product value . . . [and that] a definition of natural resources for the purposes of § 22a-19 should not be restricted to a narrow economic product value standard, but should take into

account the broader range of values envisioned by the legislative language." *Paige* v. *Town Plan & Zoning Commission*, supra, 35 Conn. App. 670 (*Schaller, J.*, dissenting).

The act, entitled "Environmental Protection Department and State Policy," proclaims as the broad policy behind its enactment: "The air, water, land and other natural resources, taken for granted since the settlement of the state, are now recognized as finite and precious. . . . [H]uman activity must be guided by and in harmony with the system of relationships among the elements of nature. . . . [T]he policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment . . . ." General Statutes § 22a-1. Similarly, the broad policy language found in General Statutes § 22a-36, which defines inland wetlands and watercourses as natural resources, cautions that the destruction of such natural resources "will continue to imperil the quality of the environment thus adversely affecting the ecological, scenic, historic and recreational values and benefits of the state for its citizens now and forever more."

In promulgating regulations regarding its responsibilities, the department of environmental protection (department) has elaborated on what constitutes natural resources.[5] Section 22a-1-1 of the Regulations of Connecticut State Agencies provides that "[t]he department operates according to powers conferred in various titles of the General Statutes relating to management, protection and preservation of the air, water, land, wildlife and other natural resources of the state . . . ." This regulatory enumeration is consistent with the legislature's express reference to plants and wild animals as

---

[5] When we interpret a statute, we generally accord great deference to the construction given it by the agency charged with its enforcement. *Crochiere* v. *Board of Education*, 227 Conn. 333, 354, 630 A.2d 1027 (1993).

natural resources in General Statutes § 22a-6a (a), which provides that "[s]uch person shall also be liable to the state for the reasonable costs and expenses of the state in restoring the air, waters, lands and other natural resources of the state, including plant, wild animal and aquatic life to their former condition . . . ." Equally consistent is the use of the term natural resources in General Statutes § 22a-342, which provides that the department, in deciding whether to grant a permit, must consider various factors including "the protection and preservation of the natural resources and ecosystems of the state, including but not limited to ground and surface water, animal, plant and aquatic life, nutrient exchange, and energy flow . . . ." Therefore, where the legislature has chosen to specifically articulate what is meant by natural resources, it has included trees and wildlife and has given no indication that the term as used throughout the act should be afforded different meanings. Moreover, had the legislature intended the illustrative lists in § 22a-6a (a) or § 22a-342 to be limited to those particular statutes, it could have provided a definitional section within the act to control all the other statutes in which the term is used. See *Neptune Park Assn.* v. *Steinberg*, 138 Conn. 357, 362, 84 A.2d 687 (1951). The narrow reading of the term natural resources ascribed by the majority of the Appellate Court contradicts the specific illustrations of what the legislature has stated a natural resource includes as found in certain provisions of the act as well as the broad policy language found throughout the act.

Finally, in interpreting a statute, "the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated." *State* v. *Russell*, 218 Conn. 273, 278, 588 A.2d 1376 (1991). As a natural resource, air, for example, has no traditional economic value because in and of itself it

can neither be bought nor sold. Applying this rule of construction, otherwise known as ejusdem generis, because the specific terms of § 22a-19 enumerate resources without economic value, the general terms must be interpreted so as to include resources regardless of their lack of economic value.

Our analysis of legislative intent also takes into account circumstances surrounding the enactment of the provisions under scrutiny. Connecticut is not the only state to have enacted legislation to protect the environment and natural resources. Michigan, Massachusetts, Texas, Pennsylvania, Colorado and California had enacted similar legislation that was reviewed by the drafters of the Connecticut legislation before the adoption of the existing act. 14 H.R. Proc., Pt. 2, 1971 Sess., p. 738. Indeed, a review of our legislative history shows that the Michigan statute served as a model for our act. Id. Like the Connecticut act, the Michigan Environmental Protection Act also used the phrase "air, water and other natural resources." Mich. Stat. Ann. § 14.528(202) (Callaghan 1995) (repealed in 1994 and reenacted as part of the Natural Resources and Environmental Protection Act, Mich. Stat. Ann. § 13A.101 et seq. [Callaghan 1995]). The Michigan Supreme Court, in interpreting that phrase, recognized that the legislature "in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather, the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality." *Ray* v. *Mason County Drain Commissioner*, 393 Mich. 294, 306, 224 N.W.2d 883 (1975). Following the direction of the Michigan Supreme Court to interpret the Michi-

gan act in favor of broad policy language over narrow and restrictive definitions, the Michigan Court of Appeals held in *Kimberly Hills Neighborhood Assn.* v. *Dion*, 114 Mich. App. 495, 503–505, 320 N.W.2d 668 (1982), that the existing plant and animal life on the land in question were natural resources. Several other Michigan courts have held that trees are a natural resource under the Michigan act. See *Portage* v. *Kalamazoo County Road Commission*, 136 Mich. App. 276, 280–81, 355 N.W.2d 913 (1984).

The view that the term natural resources is confined to the limited economic product value standard as defined by a majority of the Appellate Court is nowhere expressed in our legislative history. To the contrary, the legislative history of the act is antithetical to that conclusion. The act was promulgated on a legislative finding that there is "a public trust in the air, water and other natural resources of the state of Connecticut and that . . . [in order to protect that trust, all persons are provided] an adequate remedy to protect . . . natural resources from unreasonable pollution, impairment or destruction." General Statutes § 22a-15. The promotion of that policy has resulted in Connecticut's ranking fourth in a survey assessing all the states on the level of their commitment to environmental protection. S. Ridley, The State of the States (Fund for Renewable Energy and the Environment, 1987). Representative John F. Papandrea, the deputy majority leader, speaking in favor of the act, explained that it would expand "the right of a person to have access to the courts when property which we might say belongs to all of the public is jeopardized by the alleged polluting activity." 14 H.R. Proc., supra, p. 739. In defining the type of property that belongs "to all of the public," he added that "some of the most beautiful aspects of our environment, some of those most vital not only to our survival, but to that of future generations are such that they do not lend

themselves to a proprietary or a personal interest and this bill makes the guaranteeing and the preservation and the protection of these rights available to the general public which they are not presently under our law." Id. Therefore, the legislative history reflects a continuing interest in progressive legislation and refutes the conclusion by the Appellate Court that the legislature intended to allow citizens to sue or intervene in administrative proceedings in order to protect only those natural resources that have economic value.

Finally, we recognize the many other environmental protection statutes that expressly envision the broad range of values suggested by the language of § 22a-19 (b). In 1970, Congress enacted the National Environmental Policy Act, the purpose of which was to establish a national environmental policy to restore and maintain environmental quality, and to create and maintain conditions under which humanity and nature can coexist in productive harmony. 42 U.S.C. § 4331 (a) (1988). To enforce that policy, Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act, which established liability and the right to compensation for the release of hazardous substances causing damage to natural resources. The term natural resources was defined in that act as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources . . . ." 42 U.S.C. § 9601 (16). Similarly, the Minnesota legislature adopted a definition of natural resources that accurately and expressly reflects the broad values suggested by Connecticut's act. The Minnesota Environmental Rights Act specifically defines natural resources to include "all mineral, animal, botanical, air, water, land, timber, [and] soil . . . ." Minn. Stat. § 116B.02 (1994). Indeed, in none of the definitions of natural resources in legislation that the parties have referenced is an economic value test used. Rather, each statute is a product of legislative

efforts to save the environment and preserve it for future generations. See, e.g., Mass. Ann. Laws c. 21, § 1 (Law. Co-op. 1988) (department of environmental management charged with management, conservation, control, use, increase and development of natural resources that include the ocean, shellfish and inland fisheries; wild birds, including song and insectivorous birds; wild mammals and game; sea and fresh water fish of every description; forests and all cultivated flora, together with public shade and ornamental trees and shrubs; land, soil and soil resources, lakes, ponds, streams and coastal, underground and surface waters; minerals and natural deposits); Mich. Stat. Ann. § 13.32 (1)–(3) (Callaghan 1994) (department of natural resources charged with providing appropriate response activity to eliminate contamination to natural resources including any land, surface water, groundwater, subsurface, strata, air, fish, wildlife, or biota within the state); see also Penn. Const., art. 1, § 27 (right to public natural resources, which are common property to all people, including future generations, is right to clean air, pure water, and to preservation of natural, scenic, historic and aesthetic values of environment). Certainly, it would have been more direct for our legislature to be as explicit throughout the act as was, for example, the Minnesota legislature. In the absence of explicit contrary language, however, the interpretation of our statutes advanced by the plaintiffs promotes the policy that the act was designed to implement.

Therefore, we conclude that there is no support for the economic value test in the language of the act, in its stated purpose or in its legislative history. Indeed, given the legislative history and policy of environmental law in Connecticut, the economic value test has little place in our environmental protection statutory scheme. To require a party under § 22a-19 (a) to prove that the state resources he or she is purportedly

attempting to protect have economic value is inconsistent with and, indeed, detrimental to all expressed state and federal environmental policies.

As we have stated many times, "[w]hen the language of a statute is unclear, we may ascertain the intent of the legislature by looking beyond the language to the statute's legislative history and the purpose that the statute was intended to serve." *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 341, 612 A.2d 1203 (1992). "A statute . . . should not be interpreted to thwart its purpose." (Internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 126–27, 584 A.2d 1172 (1991). It is clear that § 22a-19, consistent with the rest of the act, was intended, not as a mere impediment to developers, but rather as a means to protect the environment from unreasonable adverse impact. We acknowledge the defendants' concerns that residential and commercial development may be burdened as a result of our rejection of the economic value test. Furthermore, we recognize that the intent to balance the tensions of environmental interests with the interests of private landowners to use and develop their land was not ill-conceived.

We understand that it was an overriding fear that "consideration of alternatives pursuant to § 22a-19 (b) for every subdivision in the state"; *Paige* v. *Town Plan & Zoning Commission*, supra, 35 Conn. App. 652; would be required that caused a majority of the Appellate Court to generate the narrow economic test. We believe, however, that those fears are unfounded. By requiring the commission to apply the reasonableness standard set forth in § 22a-19 (a), we do not anticipate a sudden influx of citizen intervenors in subdivision applications. Nor do we expect that alternative plans will be required in each case any more than if we were to adopt the economic test espoused by the Appellate Court. "By its plain terms, General Statutes § 22a-19 (b) requires the

consideration of alternative plans *only* where the commission first determines that it is *reasonably likely* that the project would cause *unreasonable pollution, impairment or destruction* of the *public trust* in the natural resource at issue. See *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, supra, [212 Conn.] 734–35; *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 499, 400 A.2d 726 (1978); *Fromer* v. *Boyer-Napert Partnership*, 42 Conn. Sup. 57, 69–71, 599 A.2d 1074, aff'd, 26 Conn. App. 185, 599 A.2d 398 (1991); 14 H.R. Proc., Pt. 2, 1971 Sess., pp. 737, 741–42. In view of the factors and standards that govern the determination in each case, any fear that a broad definition will cause alternative plans to be required in virtually every case is plainly unwarranted." (Emphasis in original.) *Paige* v. *Town Plan & Zoning Commission*, supra, 672–73 (*Schaller, J.*, dissenting).

Finally, the defendants argue that this case is controlled by *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, supra, 212 Conn. 727. In that case, we held that prime agricultural land is not a natural resource under § 22a-19. Prime agricultural land is different from what is claimed to be a natural resource in this case. Prime agricultural land is a subcategory of land subject to human alteration that is kept barren of plant and animal life that would otherwise eventually live on it through natural succession. Agricultural land is not naturally occurring. Consequently, the concerns expressed by this court in *Red Hill Coalition, Inc.*, that including prime agricultural land within the reach of the act would lead to irrational results do not apply here.

It is undisputed that in this case the commission's decision made no reference to (1) whether trees and wildlife are natural resources, (2) whether the proposed development would unreasonably pollute, impair or destroy the public trust in natural resources, or (3) whether the university was required to propose and the

commission was required to consider alternative plans. Nevertheless, the defendants argue that we should reject the plaintiffs' claims that the commission failed to consider the proposed development's unreasonable destruction of a natural resource and any feasible and prudent alternatives because many of the twenty conditions[6] imposed by the commission are evidence that the commission considered the environmental issues, including any alternatives. In contrast, the plaintiffs contend that the conditions imposed do not themselves substantiate the defendants' position.

"[O]ur case law clearly requires the trial court, in appeals from planning and zoning authorities, to search the record to determine the basis for decisions made by those authorities. In *Parks* v. *Planning & Zoning Commission*, 178 Conn. 657, 661–62, 425 A.2d 100 (1979), [we] said that [t]he [planning and zoning] commission's failure to state on the record the reasons for its actions, in disregard of General Statutes § 8-3, renders appellate review more cumbersome, in that the trial court must search the entire record to find a basis for the commission's decision . . . . [We] further stated that [i]f *any* reason culled from the record demonstrates a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld. . . . Id., 662–63. [We have] enunciated this duty of a trial court with respect to appeals from zoning boards in a long line of cases. See, e.g., *A. P. & W. Holding Corporation* v. *Planning & Zoning Board*, 167 Conn. 182, 186, 355 A.2d 91 (1974); *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 156, 292 A.2d 893 (1972). *Gagnon* v. *Inland Wetlands & Watercourses Commission*, 213 Conn. 604, 607–608, 569 A.2d 1094 (1990)." (Emphasis in original; internal quotation marks omitted.) *Paige* v. *Town Plan & Zoning Commission*, supra, 35 Conn. App.

---

[6] See footnote 3.

665–66 (*Schaller, J.,* dissenting). It is clear from the record in this case that the trial court focused on the legal issue of whether the term natural resources as used in § 22a-19 includes trees and wildlife. In concluding, incorrectly, that trees and wildlife are not natural resources protected by the statute, and that, consequently, the commission was not obligated to consider alternatives to their elimination, the trial court never fulfilled its responsibility to search the record in order to determine whether a basis for the commission's decision existed. The trial court must, therefore, review the record before the commission to determine whether the commission properly considered all of the issues presented by § 22a-19 (a) and (b), particularly whether the university's subdivision plan would result in the unreasonable destruction of the environment so as to require the commission to consider alternatives.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand it to the trial court for further proceedings.

In this opinion the other justices concurred.