ANTHONY J. PAIGE ET AL. *v.* TOWN PLAN AND ZONING
COMMISSION OF THE TOWN OF FAIRFIELD ET AL.
(12324)

HEIMAN, SCHALLER and SPEAR, Js.

Argued May 6—decision released August 30, 1994

*Frederick S. Ury,* for the appellants (plaintiffs).

*Roy H. Ervin, Sr.,* with whom, on the brief, was *Roy H. Ervin, Jr.,* for the appellee (named defendant).

*John F. Fallon,* for the appellee (defendant Fairfield University).

*Richard Blumenthal,* attorney general, and *Joseph Rubin* and *Janet P. Brooks,* assistant attorneys general, filed a brief for the commissioner of environmental protection as amicus curiae.

HEIMAN, J. The plaintiffs[1] appeal, pursuant to General Statutes § 8-8 (o), from the judgment of the trial court sustaining the decision of the defendant plan and zoning commission.[2] On appeal, the plaintiffs claim that the trial court improperly (1) found that trees and wildlife are not natural resources pursuant to General Statutes § 22a-19, (2) found that the proposed subdivision was not a cul-de-sac as defined in § 2.1.6 of the Fairfield subdivision regulations, (3) determined that the commission had not acted arbitrarily, unreasonably or illegally by finding that the proposed subdivision complied with the Fairfield subdivision regulations when the plan did not provide adequate drainage as required by §§ 1.1.8 and 3.4.4, failed to show the location of principal wooded areas on the site under § 1.1.3, showed an unsafe intersection under § 1.1.8, failed to provide for open spaces under § 2.3 and did not comply with § 1.4.2, and (4) determined that the defendant commis-

---

[1] The plaintiffs are Anthony J. Paige and Candace D. Paige.

[2] The defendants are the town plan and zoning commission of Fairfield, the town of Fairfield and Fairfield University.

sion had properly applied the appropriate standard of review in its review of the subdivision plan. We affirm the judgment of the trial court.

The following facts are necessary for a proper resolution of this appeal. Fairfield University owns 13.4 acres of land located west of North Benson Road in the town of Fairfield. The plaintiffs own land that is within a radius of 100 feet of the subject property. The land is zoned to permit single-family detached dwellings. The university submitted an application to the defendant commission to resubdivide the land into forty building lots. The university also filed an application for a special permit to excavate and fill the land. The plaintiffs intervened in the action pursuant to General Statutes § 22-19 (a).[3] After a public hearing, the defendant commission approved both applications subject to compliance by the university with twenty conditions. The plaintiffs appealed to the trial court pursuant to General Statutes § 8-8 (b). The trial court sustained the commission's approval. The plaintiffs petitioned this court for certification, which we granted.

I

The plaintiffs first claim that the trial court improperly found that trees and wildlife are not natural resources under General Statutes § 22a-19. The following facts are necessary for a proper understanding of this issue. The plaintiffs intervened pursuant to § 22a-19 (a)[4] to assert a claim that the approval of the application will have an adverse impact on the environ-

---

[3] General Statutes § 22a-19 provides in pertinent part: "(a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law . . . any person . . . may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

[4] See footnote 3.

ment. See *Burton* v. *Dillman,* 27 Conn. App. 479, 482, 607 A.2d 447, cert. denied, 223 Conn. 904, 610 A.2d 178 (1992). As such, the plaintiffs wanted the commission to consider alternative plans pursuant to § 22a-19 (b).[5] The commission approved the plan without comment on any possible environmental impact. From this action, it is apparent that the commission rejected the plaintiffs' claim that the subdivision would have an adverse impact on the natural resources of this state. On appeal to the trial court, the plaintiffs asserted that the commission improperly approved the applications because the plan required the cutting of 13.4 acres of forest resulting in the elimination of trees and of wildlife that inhabits the forest, and did not consider alternative plans that would not require such action. Specifically, the plaintiffs claimed that the trees and wildlife on the property are "natural resources" as that term is used in § 22a-19 (a) and (b). The trial court did not decide the factual issue of whether the land contains trees and wildlife. Instead, without deciding the factual issue, the trial court, relying on *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission,* 212 Conn. 727, 733, 563 A.2d 1347 (1989) (*Red Hill II*), found that trees and wildlife, while being natural resources in the generic sense, are not natural resources under General Statutes § 22a-19 (a). Thus, the trial court found that the commission was not obligated to comply with § 22a-19 (b).

"Initially, we note that the trial court's decision will not be reversed unless it is clearly erroneous. Practice

[5] General Statutes § 22a-19 (b) provides: "In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."

Book § 4061 . . . . '[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .' " (Citations omitted.) *Red Hill Coalition, Inc.* v. *Conservation Commission,* 212 Conn. 710, 723, 563 A.2d 1339 (1989) (*Red Hill I*); *Bell* v. *Zoning Board of Appeals,* 27 Conn. App. 41, 48, 604 A.2d 379 (1992). "In determining whether [trees and wildlife are natural resources] under § 22a-19, we note that '[o]ur fundamental objective in construing a statute is to carry out the apparent intent of the legislature.' . . . 'As is true in every case involving the construction of a statute, our starting point must be the language employed by the legislature.' . . . [Trees and wildlife are] not specifically referred to in § 22a-19 (a). Therefore, to determine whether the legislature meant to include [trees and wildlife] within the term 'natural resources,' we turn to the statute's legislative history and other extrinsic sources to attempt to ascertain the intent of the legislature." (Citations omitted.) *Red Hill II,* supra, 735.

The legislative history does not indicate the intent of the legislature to include trees and wildlife within the term "natural resources of the state." See 14 S. Proc., Pt. 3, 1971 Sess., pp. 1082–97; 14 H.R. Proc., Pt. 2, 1971 Sess., pp. 733–65. Even though the legislative history does not shed light on the intent of the legislature, the Regulations of Connecticut State Agencies along with other statutory provisions indicate that the legislature meant to include some trees and wildlife within the term natural resources. See *Red Hill II,* supra, 212 Conn. 735–36. The department of environmental protection's regulations state that it was created to manage, protect and preserve "the air, water, land,

wildlife and other natural resources of the state."
Regs., Conn. State Agencies § 22a-1-1. Thus, the
department of environmental protection treats wild-
life as a natural resource of the state. The legislature
also has included wildlife and plant life as part of the
natural resources protected under the Environmental
Policy Act. General Statutes § 22a-6a (a).[6] Further-
more, "[w]ords in a statute must be given their plain
and ordinary meaning . . . unless the context indi-
cates that a different meaning was intended." *Gelinas*
v. *West Hartford,* 225 Conn. 575, 584, 626 A.2d 259
(1993). Natural resource is defined as "[a]ny material
in its native state which when extracted has economic
value. Timberland, oil and gas wells, ore deposits, and
other products of nature that have economic value."
Black's Law Dictionary (6th Ed. 1990).

Even though trees and wildlife are included as natu-
ral resources, the types of trees and wildlife included

---

[6] General Statutes § 22a-6a (a) provides: "Any person who knowingly or
negligently violates any provision of section 14-100b or 14-164c, subdivi-
sion (3) of subsection (b) of section 15-121, section 15-171, 15-172, 15-175,
22a-5, 22a-6, 22a-7, 22a-32 or 22a-39, chapter 441, section 22a-69 or 22a-74,
subsection (b) of section 22a-134p, section 22a-162, 22a-171, 22a-174,
22a-175, 22a-177, 22a-178, 22a-181, 22a-183, 22a-184, 22a-190, 22a-208,
22a-208a, 22a-209, 22a-213, 22a-220, 22a-225, 22a-231, 22a-336, 22a-342,
22a-345, 22a-346, 22a-347, 22a-358, 22a-359, 22a-361, 22a-362, 22a-383,
22a-384, 22a-385, 22a-387, 22a-401 to 22a-405, inclusive, 22a-416, 22a-417,
22a-424 to 22a-433, inclusive, 22a-447, 22a-449, 22a-450, 22a-451, 22a-454,
22a-458, 22a-461, 22a-462 or 22a-471, or any regulation, order or permit
adopted or issued thereunder by the commissioner of environmental pro-
tection shall be liable to the state for the reasonable costs and expenses
of the state in detecting, investigating, controlling and abating such viola-
tion. Such person shall also be liable to the state for the reasonable costs
and expenses of the state in restoring the air, waters, lands and other nat-
ural resources of the state, including plant, wild animal and aquatic life
to their former condition insofar as practicable and reasonable, or, if resto-
ration is not practicable or reasonable, for any damage, temporary or per-
manent, caused by such violation to the air, waters, lands or other natural
resources of the state, including plant, wild animal and aquatic life and to
the public trust therein. Institution of a suit to recover for such damage,
costs and expenses shall not preclude the application of any other remedies."

under General Statutes § 22a-19 must be restricted so that the interpretation will accomplish a reasonable and rational result. *Red Hill II,* supra, 212 Conn. 737. If we were to include all trees and wildlife in the definition of natural resources of the state, "we would potentially be requiring the consideration of alternatives pursuant to § 22a-19 (b) for every subdivision in the state. We will not presume that the legislature intended such a result." Id., 738. Thus, our interpretation of the statutory phrase, "other natural resources of the state," in so far as it relates to trees and wildlife, must be tempered by consideration of the necessary tension that exists between legitimate environmental concerns; *Mario* v. *Fairfield,* 217 Conn. 164, 169, 585 A.2d 87 (1991); and the requirement that the right to develop residential and commercial zones not be unduly burdened. *Red Hill I,* supra, 212 Conn. 719. As noted in the definition of natural resources in Black's Law Dictionary, "[t]imberland . . . and other products of nature that have economic value" are natural resources. Thus, the determination as a matter of law of whether trees and wildlife are other natural resources depends on the factual determination of their economic value. Cf. General Statutes § 22a-19.[7]

---

[7] The dissent proposes the adoption of the definition contained in the Minnesota Environmental Rights Law. The adoption of this definition is antithetical to the teaching of *Red Hill II,* supra, 212 Conn. 727. The dissent states that its definition will not frustrate the teaching of *Red Hill II* because General Statutes § 22a-19 (b) still requires the consideration of alternative plans only when the commission determines that it is reasonably likely that the project would affect natural resources of this state. The dissent's explanation of how his definition complies with the teaching of *Red Hill II,* however, misapprehends our Supreme Court's language. *Red Hill II* is not concerned with developers being actually subjected to submitting alternative plans, but with the potential that developers will be required to submit alternative plans. The dissent's definition will potentially require every subdivision applicant to submit alternative plans.

Even though the trial court improperly determined that trees and wildlife are not natural resources of this state as a matter of law, a remand to the trial court for a factual determination is not required. When the commission fails to articulate the reasons for its actions, it is the function of the trial court to search the entire record before the commission to find a basis for the decision. *Parks* v. *Planning & Zoning Commission,* 178 Conn. 657, 662, 425 A.2d 100 (1979). On appeal, we review the entire record before the commission to determine the propriety of the trial court's finding. See id. Since we review the record on appeal independently, a remand to the trial court for such review is not needed. The record before the commission reveals that it had no evidence that the subdivision area had economic value. To the contrary, the testimony at the hearing indicated that the area contained absolutely no endangered or rare trees and wildlife that would cause the property to have economic value in tourism and research. Further, the testimony revealed that the property serves no other useful productive use causing the property to have economic value. Thus, our review of the record before the commission leads us to conclude that it lacked any evidence to find that the property is a natural resource of the state.[8]

II

The defendant next claims that the trial court improperly found that the proposed subdivision was not a cul-de-sac as defined in § 2.1.6[9] of the Fairfield subdivision regulations. We are unpersuaded.

---

[8] Since we have independently reviewed the record before the commission, the dissent's consternation that the plaintiff will be denied review of the record before the commission is unfounded.

[9] Section 2.1.6 of the Fairfield subdivision regulations states that a cul-de-sac is a "street closed at one end by building lots and which will not be extended in the future."

The following facts are necessary for a proper resolution of this issue. Section 2.1.6 provides that a cul-de-sac cannot provide access to more than ten building lots. The subdivision plan creates a street, Mailands Road, in the shape of a horseshoe the ends of which are connected; circles are on the end of the connecting road. The only entrance in the subdivision is at one side of the horseshoe.

The plaintiffs claimed in the trial court that the plan violated § 2.1.6 because the street is a cul-de-sac that provides access for more than ten building lots. The trial court found that Mailands Road is not a cul-de-sac. Specifically, the trial court found that the subdivision creates three separate intersecting streets with one label, that each street is not closed at one end, and that the shape of the horseshoe serves the purpose of the ten lot requirement by giving emergency vehicles access to all land.

The commission enjoys reasonable discretion in construing the regulations it is charged with enforcing. *Spero* v. *Zoning Board of Appeals,* 217 Conn. 435, 440, 586 A.2d 590 (1991); *Schwartz* v. *Planning & Zoning Commission,* 208 Conn. 146, 152, 543 A.2d 1339 (1988). " ' "[U]pon appeal, the trial court reviews the record before the [commission] to determine whether it has acted fairly or with proper motives or upon valid reasons . . . . We, in turn, review the action of the trial court." *Willard* v. *Zoning Board of Appeals,* 152 Conn. 247, 248–49, 206 A.2d 110 (1964). "The burden of proof to demonstrate that the [commission] acted improperly is upon the [plaintiff]. *Horvath* v. *Zoning Board of Appeals,* 163 Conn. 609, 316 A.2d 418 (1972); *Thorne* v. *Zoning Board of Appeals,* 156 Conn. 619, 621, 238 A.2d 400 (1968); *Talmadge* v. *Zoning Board of Appeals,* 141 Conn. 639, 642, 109 A.2d 253 (1954)." *Whittaker* v. *Zoning Board of Appeals,* 179 Conn. 650, 654, 427 A.2d 1346 (1980).' *Adolphson* v. *Zoning Board of Appeals,* 205 Conn. 703, 707, 535 A.2d 799 (1988). 'Our function on appeal is not to determine whether the trier of fact could have reached a conclusion other than the one reached . . . . "Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222, 435 A.2d 24 (1980).' *Alan* v. *Nissley,* 184 Conn. 539, 542, 440 A.2d 231 (1981)." *Shailer* v. *Planning & Zoning Commission,* 26 Conn. App. 17, 25–26, 596 A.2d 1336 (1991). "The plaintiffs bear the burden of proving that the commission acted unreasonably, arbitrarily or illegally." *Michel* v. *Planning & Zoning Commission,* 28 Conn. App. 314, 323, 612 A.2d 778, cert. denied, 223 Conn. 923, 614 A.2d 824 (1992).

Although the commission did not comment on the issue, we conclude that it found that Mailands Road

is not a cul-de-sac. On the basis of the configuration of the road shown on the map, the record supports the trial court's finding that the commission did not act unreasonably, arbitrarily or illegally in finding that Mailands Road is, in fact, three separate intersecting streets and that each street is not closed at one end. Further, the labeling of the streets with one name does not convince us that the commission's approval was unreasonable, arbitrary or illegal. The naming of the street does not change the configuration of the subdivision. The subdivision regulations provide that "it is desirable that all streets intersect at right angles." Fairfield Subdivision Regs. § 2.1.4.2. Further, the regulations provide that the intersection of local streets must have an angle of at least forty-five degrees. Id. Thus, the town regulations anticipate the intersection of streets to be at angles between forty-five and ninety degrees. It is clear from the subdivision plan that Mailands Road has three intersections with angles approaching ninety degrees. Therefore, we conclude that the record supports the trial court finding that Fairfield University complied with the applicable regulations and, thus, the commission did not act unreasonably, arbitrarily or illegally.

## III

The plaintiffs next claim that the trial court improperly determined that the commission did not act unreasonably, arbitrarily or illegally by finding that the proposed subdivision complied with the town regulations because the plan did not provide adequate drainage under §§ 1.1.8[10] and 3.4.4,[11] failed to show the

[10] Section 1.1.8 of the Fairfield subdivision regulations provides in pertinent part: "Other evidence shall be submitted establishing . . . that proper provision will be made for drainage."

[11] Section 3.4.4 of the Fairfield subdivision regulations provides: "The discharge of all storm water shall be into suitable streams or rivers or into Town drains with adequate capacity to carry the additional water."

location of principal wooded areas on the site under § 1.1.3,[12] showed an unsafe intersection under § 1.1.8,[13] failed to provide for open spaces under § 2.3[14] and did not comply with § 1.4.2[15] because of the litany of claimed delicts in the subdivision plan. We are unpersuaded.

At the outset, we note that the commission acted in its administrative capacity. *Reed* v. *Planning & Zoning Commission,* 208 Conn. 431, 433, 544 A.2d 1213 (1988). As such, it "has no discretion or choice but to approve a subdivision if it conforms to the regulations adopted for its guidance. . . . If it does not conform as required, the plan *may* be disapproved." (Citations omitted; emphasis added.) Id.; see *Friedman* v. *Planning & Zoning Commission,* 222 Conn. 262, 267, 608 A.2d 1178 (1992). Thus, if we conclude that the trial court correctly found that Fairfield University complied with the applicable zoning regulations, we must conclude that the application approval was not unreasonable, arbitrary or illegal. If we conclude that the trial court improperly found that Fairfield University complied with the regulations, we must determine whether

---

[12] Section 1.1.3 of the Fairfield subdivision regulations provides in pertinent part: "A preliminary map shall be submitted showing . . . the location of principal wooded areas. The map . . . shall be submitted at least three days prior to the meeting at which they are to receive consideration."

[13] Section 1.1.8 of the Fairfield subdivision regulations provides in pertinent part: "Other evidence shall be submitted establishing that the land to be subdivided is of such character that it can be used for purposes without danger to health or the public safety."

[14] Section 2.3 of the Fairfield subdivision regulations provides: "Open spaces for parks, playgrounds or recreational areas shall be provided in places deemed proper by the Commission. . . . No loam, fill or natural growth shall be removed from the area reserved for open space, and no foreign matter shall be permanently placed upon said space unless required by the Commission in connection with the grading, construction or development of the subdivision."

[15] Section 1.4.2 of the Fairfield subdivision regulations provides that the subdivision plan shall be approved once all the conditions of the regulations are met.

the trial court's finding that the commission did not act unreasonably, arbitrarily or illegally on the basis of the facts presented to the commission was supported by the record. See *Shailer* v. *Planning & Zoning Commission,* supra, 26 Conn. App. 17.

A

DRAINAGE

The Fairfield subdivision regulations require that the storm water pipes be at least twelve inches in diameter "as will in the judgment of the Town Engineer be sufficient to properly carry storm water expected to enter the pipe from the proposed subdivision and from other properties when developed which normally drain across the area of the proposed subdivision." Fairfield Subdivision Regs. § 3.4.1. The town engineer submitted a memo to the commission stating that "the 15 inch pipe size on the eastern portion of Mailands Road Loop and the 18 [inch] connection to the detention pond appear to be undersized for a ten year storm frequency. Please upgrade sizes or submit calculations." At the public hearing, Fairfield University asserted that the plan was adequate. In the commission's approval of the subdivision plan, the commission adopted verbatim the engineer's statement as a condition for approval without providing a detailed finding of drainage. The trial court found that the commission's approval was not illegal because the condition set by the commission was not a finding by the commission that § 3.4.1 was not met. Instead, the trial court found that the commission found that the drainage was adequate for "storm water that . . . normally drains across the area of the proposed subdivision" and that a ten year storm would generate more than normal conditions. We agree with the trial court.

The commission approved the plan with the condition that the drainage be upgraded to meet the needs

of a ten year storm. The commission did not find that the drainage was inadequate for normal drainage. Thus, we must conclude, absent other facts, that the commission found that the drainage was adequate. The town engineer did not report that drainage was inadequate. Instead, the report requested an increase to take into account a ten year storm only, not a correction of inadequate drainage. Therefore, we conclude that the record supports the trial court finding that Fairfield University complied with the applicable regulations and thus the commission did not act unreasonably, arbitrarily or illegally.

## B

### WOODED AREAS

Section 1.1.3 of the Fairfield subdivision regulations requires: "A preliminary map shall be submitted showing . . . the location of principal wooded areas." The regulations do not require that depiction in the final map. Fairfield Subdivision Regs. § 1.3.1. The parties concede that the preliminary map, which was also submitted as the final map, did not depict the location of principal wooded areas. Thus, Fairfield University did not comply with the applicable subdivision regulations. We must then determine whether the record supports the trial court's finding that the commission's approval was not unreasonable, arbitrary or illegal on the basis of the evidence before the commission in approving the plan without conforming to the applicable regulations. See *Friedman* v. *Planning & Zoning Commission,* supra, 222 Conn. 267; *Reed* v. *Planning & Zoning Commission,* supra, 208 Conn. 433.

The trial court found, and we agree, that the commission had before it evidence of the principal wooded areas, even though this evidence was not contained in the preliminary map. Fairfield University conceded at the public hearing held by the commission that the land

was 80 percent wooded. Thus, the commission knew that virtually the entire property was wooded. Further, the subdivision regulations do not require the depiction of principal wooded areas for final approval. See Fairfield Subdivision Regs. § 1.3.1. As such, the regulations demonstrate that the depiction of principal wooded areas is not a consideration to be given as great weight by the commission as other requirements that are needed in both the preliminary plan and the final plan. See *Harris* v. *Planning Commission,* 151 Conn. 95, 100, 193 A.2d 499 (1963). On the basis of the evidence before the commission and the relative importance assigned to this requirement, we conclude that the record supports the trial court finding that the commission did not act unreasonably, arbitrarily or illegally in approving the subdivision plan.

C

### DANGER TO HEALTH AND SAFETY

Section 1.1.8 of the Fairfield subdivision regulations provides that "other evidence shall be submitted establishing that the land to be subdivided is of such character that it can be used for building purposes without danger to health or the public safety . . . that any proposed street shown on the subdivision plan is in harmony with existing or proposed principal thoroughfares shown on said Master Plan especially in regard to safe intersections with such thoroughfares." The plaintiffs claim that there was no "other evidence" that Mailands Road would be in harmony with North Benson Road in regard to the intersection of the two roads. Contrary to this assertion, the trial court found that at the public hearing Fairfield University's attorney responded to questions from the commission about traffic and the proposed intersection of Mailands Road and North Benson Road.

Statements made by counsel at the hearing, in the presence of opposing counsel, are entitled to be accepted by the commission "in lieu of sworn testimony and [given] such credence and weight as, in their minds, it merited." *Parsons* v. *Board of Zoning Appeals,* 140 Conn. 290, 293, 99 A.2d 149 (1953). Thus, despite the contention by the plaintiffs in their brief, the commission did, in fact, have before it "other evidence" on the safety of the intersection of Mailands Road and North Benson Road. We conclude that the record supports the trial court's finding that Fairfield University complied with the applicable regulations and, thus, the commission did not act unreasonably, arbitrarily or illegally.

## D

### OPEN SPACES

Section 2.3 of the Fairfield subdivision regulations provides that the "open spaces for parks, playgrounds, or recreational areas shall be provided in places deemed proper by the Commission." The plaintiffs claim that the failure by Fairfield University to provide open spaces was per se fatal to the application. The trial court found, however, and we agree, that this position is incongruous to the plain language of the regulation. The regulation clearly allows the commission to determine the amount of open space required in the subdivision plan as a condition of approval. As we have already stated, the burden is on the plaintiffs to show that the commission acted improperly. *Shailer* v. *Planning & Zoning Commission,* supra, 26 Conn. App. 25–26. The plaintiffs claim only that the commission acted improperly because of the overall environmental concerns associated with the property. The plaintiffs, though, neither specify the environmental concerns nor point to specific evidence that would

mandate open spaces here. Thus, the plaintiffs' claim is unpersuasive.[16]

## IV

The plaintiffs next claim that the trial court improperly determined that the commission did not improperly apply the legal standard for determining off-site traffic safety. Specifically, the plaintiffs claim that the commission viewed off-site traffic as irrelevant under *TLC Development, Inc.* v. *Planning & Zoning Commission,* 215 Conn. 527, 532–33, 577 A.2d 288 (1990), and *Sowin Associates* v. *Planning & Zoning Commission,* 23 Conn. App. 370, 580 A.2d 91 (1990), cert. denied, 216 Conn. 832, 583 A.2d 131 (1991). Instead, the plaintiffs argue that the commission should have followed *Friedman* v. *Planning & Zoning Commission,* supra, 222 Conn. 262, which clarified *TLC* and *Sowin* by stating that the commission must consider traffic and intersection safety when the regulations provide for such a consideration. See *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission,* 222 Conn. 607, 616, 610 A.2d 1205 (1992). The commission's decision does not indicate the standard employed by it in determining that traffic safety did not require disapproval of the application. "Because public officers, acting in their official capacities, are presumed, until the contrary appears, to have acted legally and properly . . . the burden on such a claim rests upon the person asserting it." *Fonfara* v. *Reapportionment Commission,* 222 Conn. 166, 177, 610 A.2d 153 (1992). The plaintiffs provided no evidence to the trial court or to

---

[16] Since we conclude that the application did not violate any of the regulations, we need not address the plaintiffs' claim that the commission improperly approved the application in violation of § 1.4.2 of the regulations on the ground that Fairfield University did not comply with them. Our courts have consistently rejected the notion that a claim of error based on aggregating claims of nonreversible error will result in reversal of the judgment. See *State* v. *Reddick,* 33 Conn. App. 311, 338–39, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994).

this court that the commission applied the wrong standard. This court will not participate in the conjecture and speculation required in this case to determine the standard applied by the commission. See *State* v. *Carter,* 34 Conn. App. 58, 96, 640 A.2d 610, cert. granted on other grounds, 229 Conn. 919, 644 A.2d 915 (1994). Thus, their claim must fail.

The judgment is affirmed.

In this opinion SPEAR, J., concurred.

SCHALLER, J., dissenting. Two major issues in this appeal are whether trees and wildlife are "natural resources" entitled to the protection afforded by General Statutes § 22a-19, and whether the plaintiffs are entitled to relief as a result of the trial court's resolution of that issue. I disagree with the majority's disposition of these issues in two respects. First, I believe that the appropriate relief to be granted to the plaintiffs in this case is a remand to the commission with direction that it consider and decide the issues raised under § 22a-19. Second, I believe that the definition of natural resources selected by the majority is unduly narrow in light of the legislative intent expressed in § 22a-19, as well as other pertinent statutes.

A brief review of procedural history will illuminate the problems in this case. The plaintiffs, Candace Paige and Anthony Paige, intervened in the proceeding before the commission pursuant to General Statutes § 22a-19 (a), and properly requested that the commission consider alternative plans pursuant to General Statutes § 22a-19 (b). In their notices of intervention, the plaintiffs alleged that the approval of the subdivision was likely unreasonably to pollute, impair or destroy the public trust in the air, water, wildlife and other natural resources of the state because the development would require the clear cutting of 13.41 wooded acres.

At the public hearing on the matter, the engineer of the subdivision plan stated that approximately 80 percent of the 13.41 acres was wooded. A member of the commission who questioned the engineer placed the figure at approximately 90 percent. The plaintiff Candace Paige spoke in opposition to the applications, stating that the land in dispute was heavily wooded and populated by a variety of plants, animals, birds and trees. Other opponents provided written statements in opposition to the applications, and noted the vast loss of trees and wildlife that would occur if the commission approved the plan. In addition, Mylan Bull, a biologist from the Connecticut Audubon Society, stated that the area contained over fifty species of birds that would lose their nesting places with the construction of the subdivision.

The commission approved the applications of the university without specifically addressing the issues set forth in General Statutes § 22a-19 (b). Despite the statutory mandate of General Statutes § 22a-19 (b) that "the agency *shall* consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative," the commission made no findings or conclusions on this issue. (Emphasis added.) It is impossible to determine from the decision whether the commission (1) determined that trees and wildlife could not be "natural resources" as matter of law, (2) determined that trees and wildlife could be natural resources as a matter of law, but that, under the facts of this case, the trees and wildlife were not natural resources as a matter of fact, (3) determined that the trees and wildlife were, in fact and law, natural resources, but that it was not reason-

ably likely that the effect of the subdivision plan would result in the unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and, therefore, no alternative plan was necessary, or (4) failed to consider any of the issues presented by General Statutes § 22a-19 (b).

The plaintiffs pursued their available remedy, namely, an appeal to the Superior Court. In the first count of their complaint, the plaintiffs alleged that the application for the subdivision plan violated several sections of the town regulations. In the second count, the plaintiffs alleged that the commission acted "illegally, arbitrarily and in abuse of its discretion by approving the Fairfield University Resubdivision Application without considering the proposed development's unreasonable destruction of a natural resource and by failing to consider feasible and prudent alternatives." At the hearing before the trial court, counsel for both parties discussed the evidence presented before the commission and argued the merits of their positions.

I

"[O]ur case law clearly requires the trial court, in appeals from planning and zoning authorities, to search the record to determine the basis for decisions made by those authorities. In *Parks* v. *Planning & Zoning Commission,* 178 Conn. 657, 661–62, 425 A.2d 100 (1979), [the Supreme Court] said that '[t]he [planning and zoning] commission's failure to state on the record the reasons for its actions, in disregard of General Statutes § 8-3, renders appellate review more cumbersome, in that the trial court must search the entire record to find a basis for the commission's decision . . . .' [The court] further stated that '[i]f *any* reason culled from the record demonstrates a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld.' (Empha-

sis in original.) Id., 662–63. [The Supreme Court has] enunciated this duty of a trial court with respect to appeals from zoning boards in a long line of cases. See, e.g., *A. P. & W. Holding Corporation* v. *Planning & Zoning Board,* 167 Conn. 182, 186, 355 A.2d 91 (1974); *Morningside Assn.* v. *Planning & Zoning Board,* 162 Conn. 154, 156, 292 A.2d 893 (1972)." *Gagnon* v. *Inland Wetlands & Watercourses Commission,* 213 Conn. 604, 607–608, 569 A.2d 1094 (1990).

In this case, it is undisputed that the commission's decision made no reference to the General Statutes § 22a-19 issues. As noted, the commission did not reveal whether it actually determined that natural resources were not involved as a matter of law or fact; determined that natural resources were involved, but that it was not reasonably likely that any unreasonable pollution, impairment or destruction of those resources would occur, and, thus, no consideration of alternative plans was necessary; or utterly failed to make any determination on these matters. Accordingly, the commission's action in granting the application cannot reasonably be interpreted as indicating that the commission considered the § 22a-19 issues.

Beyond that, even if the commission's action is construed, as the majority contends, as a "rejection" of the plaintiffs' claims, the trial court plainly did not perform its responsibility of searching the record to find whether a basis for the commission's decision existed. Instead, the trial court, without acknowledging the absence of any decision on those issues by the commission, merely addressed in the abstract the legal issue as to whether the term natural resources as used in General Statutes § 22a-19 included trees and wildlife. Although conceding that "[i]t is beyond question that trees and wildlife are natural resources in the generic sense," the trial court concluded that they are not natural resources "within the contemplation of General

Statutes § 22a-19" by virtue of our Supreme Court's decision involving agricultural land in *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, 212 Conn. 727, 563 A.2d 1347 (1989). The trial court concluded incorrectly, therefore, that because "trees and wildlife are not natural resources protected by § 22a-19, the commission was not obliged to comply with § 22a-19 (b) by considering alternatives to the elimination of trees and wildlife which will allegedly result from the resubdivision plan approved by the commission."

In deciding this legal issue, the trial court apparently was persuaded by the legislature's omission of specific references to trees and wildlife in General Statutes § 22a-19 (b) (despite the reference to those factors in General Statutes § 22a-5),[1] and the absence of legislative history, as well as its fear that, if trees and wildlife are natural resources, "we would potentially be requiring the consideration of alternatives pursuant to General Statutes § 22a-19 (b) for every subdivision application in the state."

Given that record in the prior proceedings, the majority, itself, proceeds to search the commission record in an effort to determine whether evidence was presented to the commission that was adequate to support the *presumed rejection* of the plaintiffs' claims. I disagree with the majority's interpretation of appellate review under these circumstances. In the absence of any proper review of the commission record by the trial court, this case should be remanded to the trial

---

[1] General Statutes § 22a-5 discusses the duties and powers of the commissioner of the department of environmental protection and provides in pertinent part: "The commissioner shall . . . (b) provide for the protection and management of plants, trees, fish, shellfish, wildlife and other animal life of all types, including the preservation of endangered species; (c) provide for the protection, enhancement and management of the public forests, parks, open spaces and natural area preserves . . . ."

court for, at the very least, performance of its duty in reviewing the record; see *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra, 213 Conn. 611–12; and, more appropriately, for remand to the commission for performance of its duty of considering the General Statutes § 22a-19 issues.

Although conceding that the commission failed to "comment on any possible environmental impact," the majority elects to interpret this silence by presuming that the commission did consider the issue and "rejected the plaintiffs' claim that the subdivision would have an adverse impact on the natural resources of this state."[2] The majority concedes that the trial court, on the basis of the commission's presumed consideration of the issue, did not review the record before the commission. The result of these proceedings is that neither the commission nor the trial court has placed on the record any findings or conclusions as to the factual issues raised under General Statutes § 22a-19. The appropriate remedy under the circumstances is to direct the trial court to remand the matter to the commission for purposes of carrying out its statutory mandate. No other remedy will give the plaintiffs the opportunity to have their claims under § 22a-19 (b) considered. That procedure will produce the required factual determination for review by the trial court if an administrative appeal is brought thereafter.

---

[2] The plaintiffs are ensnared in a dilemma similar to catch-22. The reference is to Joseph Heller's novel Catch-22. In the novel, set in World War II, the only way soldiers could be relieved of active duty was for them to be insane. The catch was that they had to claim insanity. Anyone trying to claim insanity, however, clearly was sane enough to want to escape the destruction of war. This problem was known as catch-22. Here, the failure of the commission and the trial court to perform their respective functions is interpreted in a manner that effectively deprives the plaintiffs of review of their claims.

## II

The majority recognizes that the trial court improperly concluded that trees and wildlife were not natural resources of this state as a matter of law. The majority, however, adopts a narrow and restrictive definition of natural resources couched in terms of economic value. This definition, borrowed from Black's Law Dictionary, states that a natural resource is "[a]ny material in its native state which when extracted has economic value. Timberland, oil and gas wells, ore deposits, and other products of nature that have economic value." This definition apparently has been refined to include consideration of the economic value of trees and wildlife derived from "tourism" and "research." I disagree with the adoption of this definition and suggest, instead, a broader definition more in accord with the expressed legislative intent concerning natural resources.

In the absence of a detailed definition of natural resources in General Statutes § 22a-19 (b),[3] we must attempt to produce a definition that is consistent with the intent of the legislature. In doing so, we construe statutes with the assumption that the legislature is presumed to be cognizant of existing statutes, and to enact new statutes in an attempt to create a consistent body of law. *Zachs* v. *Groppo,* 207 Conn. 683, 543 A.2d 1145 (1988). We should "presume that the legislature had a purpose for each sentence, clause, or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions." *Turner* v. *Turner,* 219 Conn. 703, 713, 595 A.2d 297 (1991).

---

[3] This important problem would benefit from legislative provision of an all encompassing definition, established after appropriate consideration of all the interests involved.

The adoption of a narrow and restrictive definition disregards relevant considerations including (1) the language of General Statutes § 22a-19 (b), itself, which includes air and water within the meaning of natural resources; (2) the broad policy language of General Statutes § 22a-6a (a), which includes plant, wild animal, and aquatic life in the phrase other natural resources, (3) the broad policy language in the legislative finding of General Statutes § 22a-36, which defines inland wetlands and watercourses as natural resources, and notes that the destruction of such natural resources "will continue to imperil the quality of the environment thus adversely affecting the ecological, scenic, historic and recreational values and benefits of the state for its citizens now and forever," and (d) the language in § 22a-1-1 of the Regulations of Connecticut State Agencies, which describes the creation and authority of the department of environmental protection and states in pertinent part that "[t]he department operates according to powers conferred in various titles of the General Statutes relating to management, protection and preservation of the air, water, land, wildlife and other natural resources of the state . . . ."

In view of those legislative declarations as well as the legislative intent plainly expressed in General Statutes § 22a-19, which views natural resources in terms of values beyond the limited economic product value, a definition of natural resources for purposes of § 22a-19 should not be restricted to a narrow economic product value standard, but should take into account the broader range of values envisioned by the legislative language. The legislature clearly has recognized that we have advanced far beyond the primitive view of natural resources as no more than a source of materials available for human consumption and production, to a more realistic and forward-looking view of natural resources as a complex of interrelated elements

existing in a state of ecological balance, which must be preserved for life to survive on the planet.[4]

Definitions containing the factors that, to be consistent with legislative intent, should be taken into account are available. In 42 U.S.C.S. § 9601, part of the federal legislation regarding hazardous substance release, liability, and compensation, known as CERCLA, the definition of the term natural resources embodies the broader range of values contemplated by our legislature. Natural resources is defined as including "land, fish, wildlife, biota, air, water, ground water, drinking water, drinking water supplies, and other such resources. . . ."[5] Moreover, the definition of natural resources adopted by the Minnesota legislature accurately reflects the broad values suggested by the language of General Statutes § 22a-19 (b).[6] The Minnesota Environmental Rights Law, in relevant part, defines natural resources as including "all mineral, animal, botanical, air, water, land, timber, [and] soil

---

[4] "The visible and impending environmental impacts of our newly acquired powers have forced us to recognize that the environment consists of scarce and exhaustible resources." R. Dorfman & N. Dorfman, eds., Economics of the Environment (2d Ed. 1977) p. 2. There is a "widely felt concern over the profligate way in which mankind, and particularly Americans, have been depleting their natural resources and exploiting their environment." Id., p. ix.

"[A] commitment to environmental protection . . . today is an important part of the value system of the American people." N. Stoloff, Regulating the Environment: An Overview of Federal Environmental Laws (1991), p. 2. "People must recognize that each of us is responsible for the quality of the environment in which we all live." Id., p. 3.

[5] Land must be excluded on the basis of Red Hill Coalition, Inc. v. Town Plan & Zoning Commission, supra, 212 Conn. 738-40.

[6] In the statement of purpose of the Minnesota Environmental Rights Law, the legislature declared "its policy to create and maintain within the state conditions under which human beings and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed." 1992 Minn. Laws § 116B.01.

. . . ." 1992 Minn. Laws § 116B.02.[7] I suggest that the Minnesota Environmental Rights Law definition is consistent with the legislative intent of General Statutes § 22a-19 (b) and should be adopted by this court.

I am fully aware of the language contained in *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission,* supra, 212 Conn. 727, to the effect that a definition and interpretation of natural resources that would require· an alternative plan with respect to *every* application would not carry out the relevant legislative intent. I believe, however, that adopting the recommended definition from the Minnesota Environmental Rights Law would make the determination of whether natural resources are involved in a given case a factual determination for the agency, subject to court review. The recommended definition differs from that offered by the majority essentially in eliminating the economic value standard and requiring consideration of underlying values beyond the economic standard. The proposed definition would not result in requiring alternative plans in each case any more than would the definition adopted by the majority. By its plain terms, General Statutes § 22a-19 (b) requires the consideration of alternative plans *only* where the commission first determines that it is *reasonably likely* that the project would cause *unreasonable pollution, impairment or destruction* of the *public trust* in the· natural resource at issue. See *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission,* supra, 734–35; *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 499, 400 A.2d 726 (1978); *Fromer* v. *Boyer-Napert Partnership,* 42 Conn. Sup. 57, 69–71, 599 A.2d 1074, aff'd, 26 Conn. App. 185, 599 A.2d 398 (1991); 14 H.R. Proc., Pt. 2, 1971 Sess., pp. 737, 741–42. In view of the factors and standards that govern the determina-

---

[7] Land and soil must be excluded on the basis of *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission,* supra, 212 Conn. 738–40.

tion in each case, any fear that a broad definition will cause alternative plans to be required in virtually every case is plainly unwarranted.

Because I believe that the commission is obligated specifically to consider the issues raised by the plaintiffs under General Statutes § 22a-19 (b) and to indicate the results of that consideration, I would reverse the judgment of the trial court and remand this case to the trial court with direction to remand it to the commission for appropriate consideration and articulation with respect to the issues raised under General Statutes § 22a-19 (b).

Accordingly, I respectfully dissent.