[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
INTRODUCTION
This is an appeal from the grant of a permit (the "Permit") by the named defendant (the "Commission"). The plaintiff (the "Tribe") appeared in the proceedings before the Commission, and the Tribe filed with the Commission a notice of intervention and a verified pleading pursuant to § 22a-19(a) of the General Statutes (all further section references are to the General Statutes, unless otherwise noted).
The Permit was issued in response to an application (the "Application") filed with the Commission by the defendants Peter Blais and Sandra Blais (collectively, the "Applicant"). The Commissioner of Environmental Protection (the "Commissioner") was served with notice of this appeal pursuant to § 22a-43(a). The Commissioner has appeared pursuant to that section and, in his brief, has requested relief. CT Page 5163-NNN
STANDING
The Tribe claims standing under both §§ 22a-43(a) and 22a-19.
The relevant portion of § 22a-43(a) provides: ". . . any person owning or occupying land which abuts . . . land . . . involved in any . . . action made pursuant to (§§ 22a-36 to22a-45, inclusive [the statutes governing inland wetlands]) may . . . appeal to the superior court . . ."
After an evidentiary hearing on the Tribe's standing, it is found that the Tribe owns land, and occupies other land, which abuts the land which is the subject of the Permit, and it is therefore held that the Tribe has standing to prosecute this appeal pursuant to § 22a-43(a).
The relevant portion of § 22a-19 provides: "In any administrative, licensing or other proceeding, and, in any judicial review thereof made available by law . . . any . . . legal entity may intervene . . ."
In Red Hill Coalition, Inc. v. Town Plan Zoning Comm.,212 Conn. 727 (1989), the court stated that: ". . . one who filed a verified pleading under § 22a-19(a) became a party to an administrative proceeding upon doing so and had statutory standing to appeal for the limited purposes of raising environmental issues." Id., 734.
From the evidence introduced at the evidentiary hearing on standing, it is found that the Tribe is a legal entity. Because, as noted above, the Tribe intervened before the Commission, it is held that the Tribe also has standing to prosecute this appeal pursuant to § 22a-19(a).
THE TRIBE'S CLAIMS
The Tribe claims that the appeal should be sustained on five separate grounds. They are:
1. The Commission failed to give adequate notice;
 2. The Commission was predisposed to approve the Application; CT Page 5163-OOO
 3. The Commission allowed one of its members ("Whiteley") to sit through the hearing process even though he was predisposed to approve the Application;
 4. The Commission erroneously determined that no feasible and prudent alternative existed to the Applicants's proposed activity; and,
 5. The Commission failed to review the Application in accordance with the standards set forth in § 22a-19(b).
 Adequate Notice
The record discloses that:
 Together with the Application, the Applicant submitted detailed development plans reflecting the proposed activity;
 On August 16, 1994, the Commission voted to conduct a public hearing on September 6, 1994 concerning the Application;
 Notice of the public hearing was published on August 23, 1994 and on August 30, 1994. That notice stated:
 The Ledyard Inland Wetlands and Watercourses Commission will conduct a public hearing beginning at 8:00 P.M., Tuesday, September 6, 1994 in Council Chambers, Town Hall Annex, 741 Colonel Ledyard Highway, Ledyard, CT on the following application:
 Application #6-94, Peter and Sandra Blais, 85 Route 2, storm water discharge.
 At this hearing, interested persons may attend and be heard and written correspondence received.
 A copy of the application is on file in the Zoning Office, 741 Colonel Ledyard Highway, Ledyard, CT.
 Before the conclusion of the public hearing, the Applicant submitted to the Commission revisions (the "Revisions") of its development plans; and, CT Page 5163-PPP
 The Permit authorizes the Applicant to undertake the proposed activity reflected in the Revisions.
The Tribe claims that the Revisions changed the Application to such a degree that a new notice was required to alert the public to what the Tribe claims was the Applicant's new proposed activity. The law on this issue is clearly stated in Kleinsmithv. Planning Zoning Commission, 157 Conn. 303 (1968), where the court said:
 There is nothing in the record to indicate that at the time of the notice and prior to the hearing the defendant commission contemplated any action other than to provide adequate notice to permit interested persons to express their views at a public hearing. The very purpose of the hearing was to afford an opportunity to interested parties to make known their views and to enable the board to be guided by them. It is implicit in such a procedure that changes in the original proposal may ensue as a result of the views expressed at the hearing. Notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken upon the subject matter referred to in the notice. The changes made in the amendment as proposed arose as a result of the public hearing . . . The changes did not affect the fundamental character of the proposal for the consideration of which the hearing had been called and advertised. (Quotation marks and citations omitted.)
Id., 311-12.
After a careful comparison of the development plans submitted with the Application and the Revisions which were approved by the issuance of the Permit, the court finds that the Revisions "ensue[d] as a result of the views expressed at the hearing", and that the Revisions "did not affect the fundamental character of the proposal for the consideration of which the hearing had been called and advertised." Accordingly, it is held that the Commission provided adequate notice both of the Application and the Commission's actions.
Predisposition of the Commission
The Tribe claims that statements and comments made by Ledyard's Inland Wetlands and Water Courses official ("Treadway") CT Page 5163-QQQ and by its Planning Director ("Haase") unfairly tainted the Commission. (The Tribe also claims that the predisposition of Whiteley in favor of the Application tainted other members of the Commission. That issue is addressed in the next subsection of this memorandum.)
A local land use agency is entitled to hear from professional staff employed by or assigned to it. Yurdin v. Town Plan ZoningCommission, 145 Conn. 416 (1958); Hawkes v. Town Plan ZoningCommission, 156 Conn. 207 (1968).
In this case, the Commission received written material and oral statements and comments from Treadway and Haase, all in public session.
The offerings of Treadway and Haase contained some matters asserted as fact and others asserted as opinion, as did the offerings of other persons whose spoken and written words appear in the record; those other persons being parties, experts retained and presented by parties or members of the public. The offerings of Treadway and Haase were subject to disputation, which some of them received, and it was for the Commission, not the court, to decide their merit.
It is held that neither the making of communications to the Commission by Treadway and Haase, nor the substance of those communications, improperly tainted the Commission.
Predisposition of Whiteley
The Tribe claims, in regard to Whiteley, that:
 1. He was predisposed in favor of the Application; and,
 2. He tainted a majority of the other members of the Commission to designate the Application's proposed activity as non-core.
As to the former claim, the test for predisposition was articulated in Furtney v. Zoning Commission, 159 Conn. 585
(1970), where the court said:
 The law does not require that members of zoning commissions must have no opinion concerning CT Page 5163-RRR the proper development of their communities. It would be strange, indeed, if this were true. The decisive question in the instant case is whether (the person claimed to have had a predisposition) had actually made up his mind, in advance of the public hearing, that he was going to approve the proposed change of zone regardless of any changes or arguments in opposition which might be urged at the hearing. To discover the truth of the matter, his state of mind as a member of the commission had to be determined as a question of fact, and the burden of proving the illegality of his action was on the plaintiff.
Id., 594-95
Item 16 of the Return of Record is a draft opinion by Whiteley which bears the date August 16, 1994 and the legend "For Commission Discussion" (the "Draft Opinion"). The Draft Opinion contains proposed findings as well as Whiteley's recommendations that: 1) The proposed activity (the "Proposed Activity") be designated as "non-core"; and, 2) The Application be approved. The Tribe claims that the Draft Opinion, having been created before the September 6, 1994 public hearing, establishes a predisposition by Whiteley in favor of the Application. (It is noted that Whiteley abstained from voting on the motion to grant the Permit. T, 9-20-94, 140)
Although the portion of the Draft Opinion containing proposed findings recites that ". . . no further technical improvements in the plan . . . are reasonably possible . . .", after he heard from the Applicants at the Commission's August 16, 1994 meeting, Whiteley said: "I was wrong. There is — there were obviously (sic) the applicant proved me wrong and there are further technical improvements and they demonstrated that." (T, 8-16-94, 74)
Because Whiteley announced his error on the record, after hearing evidence presented to the Commission, it cannot be said that, in the words of the Furtney court, Whiteley "had actually made up his mind, in advance of the public hearing, that he was going to approve the proposed [action] regardless of any changes or arguments in opposition which might be used at the hearing." Thus, it is held that Whiteley was not predisposed to such an extent that he could not participate. CT Page 5163-SSS
The Tribe's second claim is that Whiteley wrongfully persuaded a majority of the Commission's members to designate the Proposed Activity a "non-core" activity under § 6.3.2. of the Regulations of the Commission (the "Regulations") (Item 3 of the Supplemental Return of Record), which would have, under the Regulations, excused the Commission from conducting a public hearing on the Application.
The Draft Opinion urged the non-core designation, and the Commission so designated the Proposed Activity. If it were determined that the non-core designation was brought about by Whiteley, that action on his part would have been wrongful only if he had been, in fact and law, predisposed. Because it has been held that Whiteley was not predisposed, this claim fails.
The claim that Whiteley improperly influenced other Commission members to designate the Proposed Activity non-core fails for a second reason. Implicit in Whiteley's recommendation of a non-core designation is his recommendation that no public hearing be held on the Application. However, the Commission voted to conduct, and did conduct, a public hearing on the Application. By rejecting Whiteley's recommendation on that matter, the Commission demonstrated that Whiteley did not improperly control the minds of a majority of his fellow Commissioners.
Commission's Finding of no Feasible and Prudent Alternative
As to the Tribe's claims that the Commission erroneously found that no feasible and prudent alternative to the Proposed Activity existed, a careful review of the transcripts of the extended public hearing before the Commission, and of the exhibits introduced at that hearing, reveals that the Commission had before it substantial evidence to support that finding.
 Commission's Failure to Review Application in Accordance with § 22A-19(b) Standards
Pursuant to § 22a-19(b), as construed in Gardner v.Conservation Commission, 222 Conn. 98 (1992), and Paige v. TownPlan and Zoning Commission, 235 Conn. 448 (1995), an agency must: 1) Determine whether there is a reasonable likelihood that unreasonable pollution will result from a proposed activity; and, if that question is answered affirmatively, the agency must then, 2) Determine whether there is a feasible and prudent alternative CT Page 5163-TTT to the proposed activity. If there is a feasible and prudent alternative, the proposed activity cannot be authorized.
In this case the Commission did not expressly decide the preliminary question whether unreasonable pollution would result from the Proposed Activity, but it did decide the ultimate question when it found that there was no feasible and prudent alternative to the Proposed Activity. Because, as held above, there was substantial evidence to support that finding, the Commission's failure to address directly the question of unreasonable pollution was of no consequence.
CONSIDERATION OF SEPTIC SYSTEM
The Commissioner argues only one point in this appeal: that the Commission was obligated, but failed, to consider whether the operation of the septic system which is part of the Proposed Activity (the "Septic System") would have an effect on the subject wetlands (the Wetlands").
(The Proposed Activity included, in addition to the Septic System, two other aspects which could have an impact on the Wetlands: 1) The installation of underground petroleum storage tanks; and, 2) A change in the flow of storm water run-off from the portion of the Applicant's property which would be developed. No claim is made by the Commissioner that the Commission failed to give proper consideration to those matters.)
At the public hearing on the Application, there was substantial evidence concerning the size, adequacy and operation of the Septic System. At its meeting of September 20, 1994, following the close of the public hearing, the Commission discussed the Application, as reflected in the transcript of that meeting (the "Transcript"). However, the Commissioner argues that, even though the Commission's discussion touched on the possible effect of the Septic System on the Wetlands, the Commission deliberately excluded the potential effect of the Septic System on the Wetlands from those things which it considered when it voted to issue the Permit because the members of the Commission who voted to issue the Permit believed that they were preempted from considering that issue by the state's jurisdiction over the installation of the Septic System.
An understanding of the Commissioner's argument requires a review of those portions of the Transcript which reflect the CT Page 5163-UUU Commission's approval of the Application and its related findings.
The vote to issue the Permit is reflected in the Transcript as follows:
 Whiteley: Roediger moved to approve the application with a requirement for a casualty control plan and annual maintenance plan to be monitored and approved by town staff.
Thompson: And the reason?
 Whiteley: The reason is no feasible and prudent alternative exists.
Thompson: Okay. Are you ready for the question?
 Gorham: Well, I'd like to say I disagree that there is no feasible and prudent alternative.
Thompson: Okay, then you would vote in that way.
 Gorham: Right. I believe what Mr. Schweid had to say. I agree with his position.
 Thompson: Okay. Any other discussion? All those in (sic)
Group: Aye.
Thompson: Opposed?
Gorham: No.
 Thompson: Abstentions. Mr. Whiteley. Okay the motion passes. (T, 9-20-94, 140)
Ancillary to its vote to issue the Permit, the Commission, by consensus of four of its five voting members (as opposed to a formal vote), made the following finding: ". . . that no further modification can reasonably be required, and that the public and individual benefit justified the, anticipated degradation." (T, 9-20-94, 145)
The Commissioner's argument has two elements: CT Page 5163-VVV
 1. The Commission was obligated to consider the effect of the Septic System on the Wetlands when it voted to issue the Permit; and,
 2. The Commission consciously excluded from its consideration the potential effect of the Septic System on the Wetlands when it voted to issue the Permit.
 Aaron v. Conservation Commission, 183 Conn. 532 (1981), establishes that the state and municipal inland wetland agencies frequently share concurrent jurisdiction. Accordingly, the fact that the Septic System required state approval did not pre-empt the Commission's responsibility to consider the effect of the Septic System on the Wetlands. Therefore, the Commissioner is correct when he argues that the Commission was obligated to consider the effect of the Septic System on the Wetlands when it voted to issue the Permit.
Whether the majority of the Commission who voted to issue the Permit excluded the effect of the Septic System on the Wetlands from their consideration is a more delicate question. As the Transcript makes clear, the language of the motion adopted by, and the finding made by, the Commission do not express whether the effect of the Septic System was considered. Gagnon v. InlandWetlands Watercourses Comm., 213 Conn. 604 (1990), establishes that in such a situation, a reviewing court is required to search the record to determine the reason(s) for the agency's action. (In this case, the relevant portion of the record is the Transcript.)
Venturing behind the formal actions and officially stated reasons of an agency in an attempt to divine those factors which motivated its members is always risky, because one can never know with certainty what was in the mind of another person at a particular time. Nonetheless, a careful review of the Transcript compels the conclusion that the members of the Commission who voted to issue the Permit were very probably not considering the issues; relating to the Septic System when they voted to issue the Permit.
The Transcript reflects that, following the close of the public hearing on the Application, the following discussion took place concerning the Septic System and its potential effect on the Wetlands. CT Page 5163-WWW
 Treadway: . . . again, that's something that the Department of Health will have to require.
 Geer (a member of the Agency): That's not even our line of work, right?
 Roediger (a member of the Agency): Are you going to review this?
 Treadway: That was my point, was that the Department of Health will have to review every step of that. (T, 9-20-94, 126-27)
Subsequently, Geer observed about the septic system: "This is a bigger deal too, but no matter how we vote tonight, the Health authority can scratch the whole thing." (T, 9-20-94, 129)
Finally, Treadway, the staff person to whom Agency members clearly looked for expertise in this area, observed: "I think our town engineer has reviewed every phase of it . . . and he reminds me that we have no control over the septic, because that's through . . . Herby Pearson." (Herby Pearson was described earlier as the Town's sanitarian.) (T, 9-20-94, 130)
The court is persuaded by the quoted excerpts that the members of the Commission who voted to issue the Permit believed in good faith, albeit mistakenly, that they had no jurisdiction over the Septic System. Accordingly, the court infers that the potential effect of the Septic System on the Wetlands was not considered by the majority of the Commission when they voted to issue the Permit, even though that matter had previously been the subject of evidence before the Commission and discussion by its members.
Because it was not the Commission's prerogative to disregard the issues relating to the Septic System, this matter must be remanded to the Commission with direction to it to act again on the Application, giving proper consideration to the effect of the Septic System on the Wetlands.
CONCLUSION
The appeal is sustained, and this matter is remanded to the Inland Wetlands Commission of the Town of Ledyard for action consistent with this decision. CT Page 5163-XXX
Levine, J.